853 A.2d 270 (2004)
371 N.J.Super. 304
DRISCOLL CONSTRUCTION CO., INC., Plaintiff-Appellant,
v.
STATE of New Jersey, DEPARTMENT OF TRANSPORTATION, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued May 26, 2004.
Decided June 18, 2004.
*271 Paul A. Logan, King of Prussia, PA, argued the cause for appellant (Powell, Trachtman, Logan, Carrle & Lombardo, attorneys; Mr. Logan, on the brief).
Thomas H. Shar, Deputy Attorney General argued the cause for respondent (Peter C. Harvey, Attorney General, attorney; Patrick DeAlmeida, Deputy Attorney General, of counsel; Mr. Shar, on the brief).
Before Judges KING, BRAITHWAITE and S.L. REISNER.
The opinion of the court was delivered by
S.L. REISNER, J.A.D.
This contract dispute involves lane closures during the construction of noise barriers along Routes 295 and 76 in Camden and Burlington Counties. Appellant Driscoll *272 Construction Co., Inc. (Driscoll), the successful bidder on the noise barrier project, contends that the contract permitted permanent lane closures, the use of concrete barriers that remain in place throughout the project. Respondent New Jersey Department of Transportation (DOT), which contracted for the work to be performed, asserts that the contract only permitted the use of temporary lane closures, the use of signs and cones that are removed and replaced daily. Because DOT refused to permit the use of permanent lane closures, Driscoll performed the contract using temporary lane closures and then sued DOT for over $3,000,000, the extra cost of using temporary lane closures.
Before any discovery was conducted, the trial judge granted summary judgment in favor of DOT, holding that the contract unambiguously prohibited the use of permanent lane closures. On appeal, Driscoll asserts that the trial judge erred in granting summary judgment to DOT, because the contract was ambiguous. We agree and therefore reverse and remand for further proceedings.

I
On June 11, 1996, Driscoll entered into a $35,635,000 contract with DOT to design and build noise barriers along Route I-76, from Route 676 to Route 295, and along Route I-295, from Route 76 to Route 73, in Camden and Burlington Counties. As a "modified design-build project," portions of the project were designed by DOT before entering into the contract and other portions of the design were assigned to the winning bidder, Driscoll, including the traffic control plans. After the contract was signed, Driscoll prepared the traffic control plans, describing how the traffic and construction would "coexist" throughout the construction project.
There are two methods of separating moving traffic from construction workers and equipment, permanent lane closures and temporary lane closures. Permanent lane closures refer to the placement of concrete barriers between traffic and the construction area. The concrete barriers remain in place until the work in the specific area is completed; the barriers are not removed at the end of each day's work. The alternative is temporary lane closures, using plastic cones, barrels, and arrow boards. Temporary lane closure materials are placed on the highway at the start of each workday and are removed at the end of each workday. Temporary lane closures increase the cost of the project, since they require significant time each day placing and removing traffic control devices, and in mobilizing and demobilizing equipment and material in and out of the work area.
In this case, the pre-bid written materials furnished by DOT included several references to traffic control. Section 110 of the Supplemental Specification states:
110.01 MAINTAINING AND PROTECTING TRAFFIC.
WHEN VEHICULAR OR PEDESTRIAN TRAFFIC OR BOTH ARE TO BE MAINTAINED WITHIN THE SCOPE OF THE PROJECT, THE CONTRACTOR SHALL DESIGN AND IMPLEMENT THE TRAFFIC CONTROL PLAN AND CARRY OUT THE WORK TO PROVIDE FOR THE SAFE AND CONVENIENT PASSAGE OF SUCH TRAFFIC.
WHEN THE CONSTRUCTION INVOLVES IMPROVEMENT OF AN EXISTING ROADWAY, THE ROADWAY SHALL BE KEPT OPEN TO TRAFFIC UNLESS OTHERWISE APPROVED BY THE PROJECT ADMINISTRATOR.
....

*273 THE ALLOWABLE HOURS OF WORK FOR THIS PROJECT ARE AS FOLLOWS:

 * ROUTE I-76 NB/SB
 * ROUTE I-295 NB/SB
 SINGLE LANE OR RAMP CLOSURE
 9/16 UNTIL 5/14
 MONDAY THRU THURSDAY 9:00 AM - 3:30 PM
 7:00 PM - 6:00 AM
 THE FOLLOWING DAY
 FRIDAY 9:00 AM - 2:00 PM
 9:00 PM - 6:00 AM
 MONDAY
 5/15 UNTIL 9/15
 MONDAY THRU THURSDAY 9:00 AM - 3:30 PM
 7:00 PM - 6:00 AM
 THE FOLLOWING DAY
 FRIDAY 9:00 AM - 2:00 PM
MULTIPLE LANE CLOSURES
(MUST PROVIDE MINIMUM OF ONE LANE OPEN IN EACH DIRECTION)
 MONDAY THRU THURSDAY 11:00 PM - 6:00 AM
 THE FOLLOWING DAY
 FRIDAY 12:00 PM - 10:00 AM
 SATURDAY
 SATURDAY 7:00 PM - 12:00 NOON
 SUNDAY
 SUNDAY 6:00 PM - 6:00 AM
 MONDAY

SHOULDER CLOSURES ARE PERMITTED ANY TIME OF DAY.
DUE TO TRAFFIC SITUATIONS GENERATED BY EVENTS OR ACTIVITIES AT VETERANS STADIUM (INCLUDING PHILLIES GAMES, EAGLES GAMES AND CONCERTS), THERE MAY BE OCCASIONS FOR WHICH NON-PERMANENT LANE CLOSURES WILL NOT BE PERMITTED. THE WORK HOURS THE CONTRACTOR MAY BE RESTRICTED WILL BE DEPENDENT ON THE TIMING OF THE EVENTS.
THERE MAY BE OTHER OCCASIONS FOR WHICH THE CONTRACTOR MAY BE ASKED TO STOP WORK AND WILL NOT BE PERMITTED TO REDUCE THE NUMBER OF LANES AVAILABLE TO TRAFFIC. WORK WHICH WILL INTERFERE WITH TRAFFIC WILL NOT BE PERMITTED, BUT WORK WITHIN ALL PERMANENT LANE CLOSURES WILL BE PERMITTED AT ALL TIMES.
WHEN DETERMINING HIS BID PRICES AND ESTIMATING THE NUMBER OF CALENDAR DAYS TO SUBSTANTIALLY COMPLETE THE PROJECT, THE CONTRACTOR SHALL ASSUME HE WILL BE PERMITTED TO REDUCE THE NUMBER OF LANES AVAILABLE TO TRAFFIC AS SHOWN IN THE PLANS. THE CONTRACTOR SHALL NOT CONSIDER LOSS OF TIME DUE TO WORK STOPPAGES AS A RESULT OF EVENTS AT VETERANS STADIUM OR OTHER OCCURRENCES. IF THE CONTRACTORS SCHEDULE OF WORKING HOURS IS RESTRICTED DUE TO THESE UNFORESEEN TRAFFIC OCCURRENCES, HE WILL BE GRANTED AN APPROPRIATE EXTENSION OF TIME FOR THE WORK WHICH COULD NOT BE COMPLETED OUTSIDE THE PERMANENT LANE CLOSURES.

PLEASE NOTE THAT LANE CLOSURES WILL NOT BE PERMITTED AFTER NOON OF THE DAY BEFORE, DURING AND UNTIL NOON OF THE DAY AFTER THE FOLLOWING HOLIDAYS OR HOLIDAY WEEKEND PERIODS: NEW YEAR'S DAY, PRESIDENT'S DAY, GOOD FRIDAY, MEMORIAL *274 DAY, INDEPENDENCE DAY, LABOR DAY, THANKSGIVING, AND CHRISTMAS. LANE CLOSURES WILL NOT BE PERMITTED ON ELECTION DAY BETWEEN THE HOURS OF 9 AM AND 8 PM.

....
A PENALTY IN ACCORDANCE WITH THE SCHEDULE CHEDULE BELOW WILL BE ASSESSED AGAINST THE CONTRACTOR IF THE LANE CLOSURES ARE NOT PLACED OR REMOVED IN ACCORDANCE WITH THE SPECIFIED TIMES.

 TIME FRAME OCCUPANCY CHARGE PER LANE
 1-15 MINUTES $ 2000 + 200/MINUTE
 16-30 MINUTES $ 5000 + 333/MINUTE
 31-45 MINUTES $10000 + 666/MINUTE
 46 MINUTES OR LONGER $20000 + 1000/MINUTE

THE FOLLOWING NOTE SHALL BE PLACED ON THE FIRST SHEET OF THE TRAFFIC CONTROL PLANS.
THE CONTRACTOR SHALL NOTIFY THE PROJECT ADMINISTRATOR A MINIMUM OF 72 HOURS PRIOR TO THE START/COMPLETION OF ANY STAGE OF THE PROJECT. aLL TRAFFIC RESTRICTIONS, INCLUDING LANE WIDTH AND REDUCTIONS, LANE CLOSURES AND DETOURS ARE SUBJECT TO APPROVAL OF THE PROJECT ADMINISTRATOR, THE REGIONAL TRAFFIC ENGINEER, AND THE BUREAU OF TRAFFIC OPERATIONS SOUTH.
The specifications did not specifically prohibit the use of permanent lane closures. Nor did the conceptual plans detail intended lane closures, either temporary or permanent. According to Driscoll, as part of its due diligence investigation, it reviewed DOT's contract with another contractor, Crisdel Group, Inc. (Crisdel), for roadway reconstruction within substantially the same sections of the highway involved in the Driscoll noise barrier project. The Crisdel traffic control specifications were identical to the traffic control specifications for the Driscoll noise barrier project. The traffic control plans designed by DOT based on those pre-bid specifications required permanent lane closures in completing the contract. Based on the specification language and review of the Crisdel contract, Driscoll interpreted Section 110.01 to permit the use of permanent lane closures. Driscoll based its bid price and timetable to complete the work upon traffic controls utilizing permanent lane closures.
Driscoll was awarded the contract and thereafter submitted traffic control plans utilizing permanent lane closures. On October 2, 1996, DOT rejected the proposed traffic control plans, contending that the specifications did not permit the use of permanent lane closures, except shoulder closures, and only temporary lane closures were permitted. DOT requested that Driscoll resubmit traffic control plans which did not include permanent lane closures.
On October 4, 1996 Driscoll submitted a notice of claim to DOT, charging that the specification allowed permanent lane closures and DOT's rejection of the proposed permanent lane closures was a "change of character" under the contract. On October 10, 1996, DOT replied to Driscoll's notice of claim, asserting that the specification excluded permanent lane closures and denying that its rejection of the proposed permanent lane closures was a change of character under the contract.
Driscoll proceeded to construct the noise barriers, using temporary lane closures. On September 6, 2001, Driscoll supplemented its October 4, 1996 notice of claim by including the total additional cost, $3,199,968.02, allegedly resulting from performing the contract without permanent *275 lane closures. DOT again denied the claim in a letter dated April 2, 2002.
Driscoll filed a complaint on April 25, 2003, seeking a judgment of $3,279,613.95 to compensate for extra costs of using temporary lane closures. DOT filed a motion for summary judgment. Driscoll filed a responsive cross-motion for summary judgment. The trial judge issued a written tentative disposition on July 24, 2003:
The language in the Supplemental Specification is clear on its face. The general requirement is that the highway must be open to traffic, and closure is only permitted when approved by the project administrator.... Furthermore, the Supplemental Specification clearly details when Driscoll is to work and when lanes may be closed. It is true that the Contractor will design the plan, but the Supplemental Specification also states that the roadway shall be kept open to traffic unless otherwise approved by the project administrator. Additionally, there are other clauses which establish that preference to keep traffic flowing and avoid permanent lane closures. For example, the first paragraph of the Supplemental Certification states that the traffic control plans are to be designed to provide the safe and convenient passage of such traffic. Also, the Supplemental Specification states that Driscoll is not to work during events at Veterans Stadium, and other occasions. The Supplemental Specification even sets forth a penalty for not opening the roads during the times set forth in the Specification. No where in the Supplemental Specification does it state that Driscoll can unilaterally close the roads. Rather, the Supplemental Specification read as a whole as well as line by line indicate that DOT's intent was not to allow for unnecessary road closures.
Driscoll maintains that the contract can be reasonably interpreted to allow Driscoll to utilize permanent lane closures in performing work of the project. In support of this contention Driscoll cites to a clause in the Supplemental Specification that allows for the shoulder closures. The court finds that clause allowing for shoulder closures does not also allow for permanent lane closures. Driscoll also maintains that the contract allowed for permanent lane closures because a separate contract between DOT and Crisdel Group, Inc. (Crisdel) allowed for permanent lane closures. However, the Crisdel contract has no bearing on this contract because here the terms of the contract are unambiguous and clear  Driscoll cannot unilaterally close the roads and every effort will be made to keep the traffic flowing. Furthermore, as to the Crisdel contract, Driscoll was not a party to the Crisdel contract, the scope of the contract was different than the work in the Driscoll contract because Crisdel performed reconstruction work on the roadway whereas Driscoll erected noise barriers off travel lanes and along the side of the shoulder, and most importantly, no reference to the Crisdel contract was made in the DOT-Driscoll contract at issue.
Accordingly, Defendant's motion for summary judgment is granted and Plaintiff's cross motion for summary judgment is denied.
Following oral argument, the judge rendered an opinion granting DOT's motion for summary judgment for the same reasons detailed in the tentative disposition, concluding:
I'm satisfied that the supplemental specification made it clear enough ... that it was well within the purview of the Department of Transportation to not allow permanent lane closure. The *276 overriding philosophy behind all of this was to keep the traffic going as much as possible.... [T]he defendant's motion which was filed first for summary judgment is granted and the cross-motion is denied.
Driscoll appealed.

II
Summary judgment is appropriately granted if "the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). On appeal, this court reviews the trial courts decision de novo, "applying the same legal standard as the trial court under R. 4:46-2(c)." Turner v. Wong, 363 N.J.Super. 186, 198-99, 832 A.2d 340 (App.Div.2003) (citing Antheunisse v. Tiffany, 229 N.J.Super. 399, 402, 551 A.2d 1006 (App.Div.1988), certif. denied, 115 N.J. 59, 556 A.2d 1206 (1989)).
In this case, the dispositive question was whether the contract prohibited the use of permanent lane closures. The trial judge concluded in her tentative disposition, "[t]he language in the Supplemental Specification is clear on its face ... establish[ing][the] preference to keep traffic flowing and avoid permanent lane closures." The judge modified her findings in her oral opinion granting DOT's motion for summary judgment, holding, "I'm satisfied that the supplemental specification made it clear enough ... that it was well within the purview of the Department of Transportation to not allow permanent lane closure." (emphasis added). Based on our review of the record, we conclude the contract was ambiguous on its face and that the case was not ripe for summary judgment.
When interpreting a contract, the court's goal is to ascertain the "intention of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain...." Onderdonk v. Presbyterian Homes of N.J., 85 N.J. 171, 184, 425 A.2d 1057 (1981)(quoting Atl. N. Airlines, Inc. v. Schwimmer, 12 N.J. 293, 301, 96 A.2d 652 (1953)). The interpretation or construction of a contract is usually a legal question for the court, "suitable for a decision on a motion for summary judgment." Spaulding Composites Co., Inc. v. Liberty Mut. Ins. Co., 346 N.J.Super. 167, 173, 787 A.2d 238 (App.Div.2001), rev'd on other grounds sub nom., Spaulding Composites Co., Inc. v. Aetna Cas. and Surety Co., 176 N.J. 25, 819 A.2d 410 (2003), cert. denied, ___ U.S. ___, 124 S.Ct. 1061, 157 L.Ed.2d 953 (2004); see also Bosshard v. Hackensack Univ. Med. Ctr., 345 N.J.Super. 78, 92, 783 A.2d 731 (App.Div.2001) ("The interpretation of the terms of a contract are decided by the court as a matter of law unless the meaning is both unclear and dependent on conflicting testimony."). However, "where there is uncertainty, ambiguity or the need for parol evidence in aid of interpretation, then the doubtful provision should be left to the jury." Great Atl. & Pac. Tea Co., Inc. v. Checchio, 335 N.J.Super. 495, 502, 762 A.2d 1057 (App.Div.2000) (citing Michaels v. Brookchester, Inc., 26 N.J. 379, 387, 140 A.2d 199 (1958); Garden State Bldgs. v. First Fid. Bank, 305 N.J.Super. 510, 525, 702 A.2d 1315 (App.Div.1997), certif. denied, 153 N.J. 50, 707 A.2d 153 (1998)). Since this case involves a contract claim against the State, it would be tried without a jury, N.J.S.A. 59:13-4, however, the principle is the same; the judge acts as trier of fact as well as deciding issues of *277 law and cannot grant summary judgment where material facts are in dispute.
In this case, the specifications about the use of permanent lane closures were ambiguous, and parol evidence was required to resolve the ambiguity. Portions of the contract indicate that permanent lane closures are prohibited. The contract states that closure is only permitted when approved by the project administrator. The contract details when Driscoll is to work, when lanes may be closed, and when penalties may be imposed for closing the roads during those times. Arguably, the gaps in the permissible times for road closure exclude the use of permanent lane closures. Other clauses indicate a preference for the "safe and convenient passage of [ ] traffic."
On the other hand, portions of the contract indicate that permanent lane closures are not prohibited. The contract prohibits the use of "non-permanent lane closures" during events at Veterans Stadium, suggesting that the use of permanent lane closures during these times is permitted. The contract indicates that on other unspecified occasions Driscoll is not permitted to interfere with traffic, "but work within all permanent lane closures will be permitted at all times." Driscoll understood that this project-specific language allowed the use of permanent lane closures.
DOT contends that "permanent lane closures" referred to shoulder closures. Driscoll produced evidence that DOT's assertion is contrary to the trade usage of the term "permanent lane closures" in the road construction industry. Further, DOT's interpretation conflicts with specific references to "shoulder closures" in other parts of the contract.
Viewed in a light most favorable to Driscoll, the evidence is sufficient to permit a rational factfinder to resolve the disputed issue in favor of Driscoll. See, Brill, supra, 142 N.J. at 540, 666 A.2d 146; see also City Check Cashing, Inc. v. Mfrs. Hanover Trust Co., 166 N.J. 49, 64, 764 A.2d 411 (2001) (observing that summary judgment is appropriate only when no fair-minded jury could reach a contrary conclusion). A trial court should never decide on its merits a dispute on which a rational jury could go either way. See, Gilhooley v. County of Union, 164 N.J. 533, 545-46, 753 A.2d 1137 (2000). In this case, at least on the limited record before the trial judge, a rational jury could decide the critical issue either way.
DOT contends that the following excerpt from the Supplemental Specification is a "clear provision ... which authorizes only temporary lane closures":
WHEN VEHICULAR OR PEDESTRIAN TRAFFIC OR BOTH ARE TO BE MAINTAINED WITHIN THE SCOPE OF THE PROJECT, THE CONTRACTOR SHALL DESIGN AND IMPLEMENT THE TRAFFIC CONTROL PLAN AND CARRY OUT THE WORK TO PROVIDE FOR THE SAFE AND CONVENIENT PASSAGE OF SUCH TRAFFIC.
WHEN THE CONSTRUCTION INVOLVES IMPROVEMENT OF AN EXISTING ROADWAY, THE ROADWAY SHALL BE KEPT OPEN TO TRAFFIC UNLESS OTHERWISE APPROVED BY THE PROJECT ADMINISTRATOR.
We conclude that this statement is ambiguous. The term "lane closures" is omitted altogether and the provision can be construed as simply providing guidelines to assist Driscoll in drafting the traffic control plans.
Similarly, DOT cites the following language from the Supplementary Specifications as evidence that permanent lane closures were prohibited: "When determining *278 his bid prices and estimating the number of calendar days to substantially complete the project, the contractor shall assume he will be permitted to reduce the number of lanes available to traffic as shown in the plans." Based on this provision, DOT asserts, "[t]here are no permanent lane closures on the plans. Consequently, Driscoll had no right to assume there were permanent lane closures when Driscoll calculated its bid prices, and time and area available for work."
This argument is unpersuasive and illustrates the ambiguity of the specifications. This project-specific provision does not inform a potential bidder whether DOT is referring to the conceptual plans or the traffic control plans. Regardless, neither of the plans clarifies the intent of the parties. DOT has represented to the court that the conceptual plans (not provided in the record) do not reflect any road closures, temporary or permanent. The traffic control plans were not even in existence at the time of the specifications, as the winning bidder was to prepare the traffic control plans as part of the design-build project.
Because she concluded that the contract was unambiguous, the trial judge refused to consider a similar road construction contract between DOT and Crisdel, a project that used permanent road closures. However, as we stated in Great Atl. & Pac. Tea Co., Inc., supra, ambiguity is not a prerequisite to introducing circumstances surrounding the contract:
When the meaning of an integrated contract is ambiguous, the surrounding circumstances may be introduced for the purpose of elucidation. New York Sash & Door Co., Inc. v. National House & Farms Ass'n, Inc. 131 N.J.L. 466 [36 A.2d 891] (E. & A.1944). Even when the contract on its face is free from ambiguity, evidence of the situation of the parties and the surrounding circumstances and conditions is admissible in aid of interpretation. [Atl. N. Airlines Inc., supra, 12 N.J. at 301-02, 96 A.2d 652.]
"The admission of evidence of extrinsic facts is not for the purpose of changing the writing, but to secure light by which to measure its actual significance. Such evidence is adducible only for the purpose of interpreting the writing  not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning of what has been said." Casriel v. King, 2 N.J. 45 [65 A.2d 514] (1949).
Accordingly, whether the clause under consideration is regarded as clear and certain, or ambiguous and uncertain, if the intention of the parties is not to be gleaned from a reading of the instrument as a whole, the plaintiff should have had the opportunity of presenting evidence of the facts and circumstances surrounding the execution of the lease.
[Great Atl. & Pac. Tea Co., Inc., supra, 335 N.J.Super. at 501, 762 A.2d 1057(citations omitted).]
In this case, the trial judge erred in refusing to consider evidence of the surrounding circumstances, the use of permanent road closures in a different DOT construction contract employing identical traffic control language. For purposes of the summary judgment motion, it was inconsequential whether the DOT-Driscoll contract was clear or ambiguous, and irrelevant that Driscoll was not a party to the Crisdel contract, that the scope of the Crisdel contract was different (Crisdel performed work on the roadway), and that no reference to the Crisdel contract was made in the DOT-Driscoll contract. Because a reasonable trier of fact might conclude that DOT's prior practices provided objective evidence of what the parties intended, *279 Driscoll's reliance upon the prior practice based on identical language in the Crisdel contract should have been considered.
Other considerations also lead us to conclude that summary judgment was erroneously granted. A trial court should not grant summary judgment when the matter is not ripe for such consideration, such as when discovery has not yet been completed. See, Salomon v. Eli Lilly & Co., 98 N.J. 58, 484 A.2d 320 (1984). The court should afford "every litigant who has a bona fide cause of action or defense the opportunity for full exposure of his case." Oslacky v. Borough of River Edge, 319 N.J.Super. 79, 87, 724 A.2d 876 (App.Div.1999) (quoting Velantzas v. Colgate-Palmolive Co. Inc., 109 N.J. 189, 193, 536 A.2d 237 (1988)). In fairness to the trial judge, since both sides moved for summary judgment, one may fairly assume that the evidence was all there and the matter was ripe for adjudication. Morton Intl., Inc. v. Gen. Accident Ins. Co. of Am., 266 N.J.Super. 300, 323, 629 A.2d 895 (App.Div.1991), affd, 134 N.J. 1, 629 A.2d 831 (1993), cert. denied, 512 U.S. 1245, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994). However, cross-motions of summary judgment do not, of necessity, obviate a plenary trial on disputed issues of fact. Ibid. (citing O'Keeffe v. Snyder, 83 N.J. 478, 487, 416 A.2d 862 (1980)).
In this case, no discovery had been exchanged at the time the motion was filed. To the extent that evidence was not fully presented due to the procedural infancy of the case, the motion for summary judgment was premature.
Moreover, where an ambiguity exists in the contract allowing at least two reasonable alternative interpretations, the writing is strictly construed against the drafter. See, e.g., In re Estate of Miller, 90 N.J. 210, 221, 447 A.2d 549 (1982). Public authorities, who choose contract terms when they invite contractors to bid on construction projects, are not exempt from this doctrine. Terminal Constr. Corp. v. Bergen County Hackensack River Sanitary Sewer Dist. Auth., 18 N.J. 294, 302, 113 A.2d 787 (1955). In this case, on this record, the contract appears to be ambiguous and must be construed against DOT. For example, instead of using language that allowed for two reasonable alternative explanations, DOT could have stated, PERMANENT LANE CLOSURES ARE PROHIBITED AT ALL TIMES. DOT did not explicitly express its purported intent to prohibit permanent lane closures.
We hasten to add that we are not deciding the underlying merits of this dispute. After discovery is completed, there may prove to be no dispute that, in the context of prevailing industry practice, the contract is not ambiguous. Likewise, if there are conflicting proofs, the judge might reach that conclusion after trial. However, on the undeveloped record before the trial court at the time the motion was decided, giving Driscoll the benefit of all favorable inferences, the contract appears ambiguous and summary judgment was inappropriate.
Reversed and remanded for further proceedings.