**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1477-21

HOLTEC INTERNATIONAL,

    Plaintiff-Respondent/
    Cross-Appellant,

v.

NEW JERSEY ECONOMIC
DEVELOPMENT AUTHORITY,

    Defendant-Appellant/
    Cross-Respondent.

_____

Argued November 1, 2023 – Decided November 30, 2023

Before Judges Firko, Susswein and Vanek.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-0696-20.

Eric Corngold (Friedman Kaplan Seiler & Adelman LLP) of the New York bar, admitted pro hac vice, argued the cause for appellant/cross-respondent (Friedman Kaplan Seiler & Adelman LLP, attorneys for appellant/cross-respondent; Blair R. Albom and Eric Corngold, on the briefs).

Lance Jon Kalik argued the cause for respondent/cross-appellant (Riker Danzig, LLP, attorneys: Lance Jon Kalik, Michael P. O'Mullan, and Charles B. McKenna, of counsel and on the briefs; Corey L. LaBrutto and Austin W.B. Hilton, on the briefs).

PER CURIAM

This appeal arises from defendant New Jersey Economic Development Authority's (NJEDA or Authority) decision to rescind tax incentive credits it awarded to plaintiff Holtec International (Holtec) under the New Jersey Grow Program. In 2014, NJEDA agreed to award $260 million in tax credits over a ten-year period to induce Holtec to build a new technology campus in Camden. Holtec built the facility and continues to operate it. NJEDA initially certified the tax credits. In June 2019, the Office of the State Comptroller issued a report alleging Holtec had misrepresented facts in its application. The public report criticized NJEDA for its lack of diligence in enforcing the tax incentive program. Thereafter, NJEDA refused to certify tax credits for the 2018 tax year, prompting Holtec to file the present lawsuit.

NJEDA appeals from an order issued by Judge Robert T. Lougy granting summary judgment to Holtec. Judge Lougy concluded in a well-reasoned forty-one-page written opinion that NJEDA could not void the tax incentive agreement, finding that certain provisions in the application were ambiguous

and should be construed against NJEDA, which drafted the application. The judge concluded that Holtec did not make any material misrepresentations in its application for tax credits. After carefully reviewing the record in light of the governing legal principles and arguments of the parties, we affirm.

I.

We discern the following facts and procedural history from the record. The Grow New Jersey Assistance Act, N.J.S.A. 34:1B-242 to -249, enacted in 2011, authorizes NJEDA to award tax credits to eligible businesses "to encourage economic development and job creation and to preserve jobs that currently exist in New Jersey but which are in danger of being relocated outside of the State." N.J.S.A. 34:1B-244(a). The Economic Opportunity Act of 2013 (the 2013 Act) modified the tax incentive program to encourage "capital investment" where "the resultant retention and creation of full-time jobs will yield a net positive benefit to the State. . . ." L. 2013, c. 161. The 2013 Act also contained provisions to encourage businesses to remain in or relocate to a Garden State Growth Zone under the Municipal Rehabilitation and Economic Recovery Act, N.J.S.A. 52:27BBB-1 to -65. Ibid.

Throughout 2013 and 2014, NJDEA and Holtec discussed a possible application under the Grow Program. Those preliminary discussions focused on

Holtec's interest in building a new technology campus. NJDEA's then-president agreed during his deposition that the parties had a mutual interest in relocating to Camden because it was the only city that was a designated Garden State Growth Zone and qualified under the Municipal Rehabilitation and Recovery Act. He also confirmed Holtec's initial application featured a $350 million project and the relocation of jobs from Holtec's facility in Marlton. After the preliminary discussions, Holtec formally applied for tax incentives under the Grow Program.

The application form had an "Additional Background Information" section that began by explaining,

> [b]usinesses applying for eligibility for NJEDA programs are subject to the Authority's Disqualification/Debarment Regulations (the "Regulations"), which are set forth in N.J.A.C. 19:30-[2.1 to -8.3]. Applicants are required to answer the following background questions pertaining to the commission of certain actions that can lead to debarment or disqualification from eligibility under the Regulations.

"Item 8" of the background questions reads "[d]ebarment by any department, agency, or instrumentality of the State or Federal government."

On January 20, 2014, defendant submitted its application and responded "[n]o" to Item 8. The application did not disclose that the Tennessee Valley

4

Authority (TVA) had disbarred Holtec for ten days in December 2010. The brief debarment occurred pursuant to an administrative agreement with the TVA. The disbarment was based "upon alleged actions and conduct taken by or on behalf of Holtec in connection with the facts underlying the plea agreement of [a] former TVA employee. . . ." No civil, criminal, or administrative proceeding took place. Moreover, the debarment was publicly reported.

Holtec's application also stated it had "robust proposals" from South Carolina, Pennsylvania, and Ohio. New Jersey was competing with these states in Holtec's "strategic decision making process on where to center its technological operations for the next one hundred years." Holtec identified South Carolina as the number one competitor with New Jersey, and certified "April 1, 2014 would be the first date in which [it] would choose to hire at another location."

Aside from the information provided in the four corners of the application, the record shows that Holtec represented to NJEDA staff in meetings and other communications that it had an offer of free land in South Carolina, specifically at a shipyard in Charleston. An undated letter on Holtec letterhead was produced in discovery entitled, "Why Expand Holtec International in New Jersey?" The letter states, "Holtec has discussed constructing a new 650,000 square foot

5

[technology center] in Charleston, South Carolina. South Carolina will give Holtec the land." This letter appears to be related to a February 7, 2014 email from the Holtec employee serving as the NJEDA liaison, to Holtec's CEO and president, Dr. Kris Singh, with the subject line "Re: Camden Update -- NJEDA Call Today." On February 9, 2014, Holtec's CEO replied, stating, in part, "[r]egarding why NJ, I will send you some written text to help you get the story together. . . ."

At his deposition, Singh was asked if Holtec "had a clear offer from South Carolina for free land?" Singh responded, "I believe that we had an informal offer of land and a lot of other things. Free land would not even enter our consideration if that's all they offered." Singh testified that he could not remember whether his discussions with South Carolina specifically included an offer of free land. However, he stated that Charleston was a desirable location in part due to its port.

Holtec also had business dealings in South Carolina, including a joint proposal related to a small modular reactor at a site along the Savannah River. Holtec had conversations with the former South Carolina Governor and representatives of South Carolina's Department of Commerce about relocating

6

to that state. However, as Judge Lougy noted in his findings, there is nothing in the record showing South Carolina made a definitive offer of free land to Holtec.

Another NJEDA employee testified that the Grow Program's administrators did not require "a written offer from another state" regarding relocation. This policy decision was deliberate; NJDEA did not want to encourage applicants to engage in negotiations with other states.

Prior to the Holtec application, NJEDA had been put on notice as to problems with the application form. For example, in December 2012, another Grow Program applicant, Siemens Healthcare Diagnostics, Inc., informed NJEDA via an addendum to its application that "some of the items 1-10 are not worded as a question." Other applicants had also expressed confusion or frustration with the application form with respect to the background items. NJEDA acknowledged such deficiencies to some of these applicants. Moreover, Marcus Saldutti, an NJEDA employee, testified that NJEDA informed those applicants it only considered information about civil matters that occurred within five years preceding an application, and only considered criminal or regulatory matters that occurred within the preceding ten years.

Saldutti also acknowledged that in the course of reviewing applications from companies that made insufficient disclosures, he wrote an internal email

A-1477-21

stating, "[u]ltimately, we're most concerned with admissions or findings of guilt or liability in concluded matters and with serious yet unresolved matters, as well." He further clarified that applicants only had to disclose such legal issues for the applicant and its "control group," consisting of "officers or directors of the applicant or any affiliates."

The criticisms of the application form prompted changes to the application process. The Grow Program issued a new application form in 2016 that modified the additional background information section to read:

> Has Applicant, any officers or directors of Applicant, or any Affiliates (collectively, the "Controlled Group") been found guilty, liable or responsible in any Legal Proceeding for any of the following violations or conduct? (Any civil or criminal decisions or verdicts that have been vacated or expunged need not be reported).

The 2016 application form also explicitly defined "legal proceeding" as "any State, Federal or foreign civil, criminal or administrative proceeding in a court or administrative tribunal in the United States, any territories thereof or foreign jurisdiction."

NJEDA acknowledged other applicants that engaged in corporate misconduct are still receiving tax credits without penalty. At a public hearing held by the New Jersey Task Force on the Economic Authority's Tax Incentives

on October 17, 2019, Saldutti testified he prepared disciplinary reports for the NJEDA board that made recommendations on whether an applicant's misdeeds or failures to disclose misconduct "r[o]se to the level of a disqualification." Past misconduct, or non-disclosure of past misconduct, he acknowledged, did not necessarily disqualify an applicant.

For example, Saldutti recommended approving Siemens's application despite its parent company's 2008 guilty plea to violations of the Foreign Corrupt Practices Act, which it had not disclosed in its initial application. Similarly, he recommended approving JP Morgan's Grow Program application despite its 2015 guilty plea "to one felony count of conspiring to fix prices and rig bids for US dollars in Euro exchanged in the foreign exchange spot market," which resulted in a $355 million fine levied by European regulators.

Saldutti stated he only remembered one business that had its application denied, referring to it as an "outlier." That business, a marina, was partially owned by an individual who pled guilty to criminally negligent homicide in New York in 2007 in connection with a trench collapse at a construction project. During the public hearing, Saldutti acknowledged that based on the twenty-five memoranda he drafted, nothing "short of death" would "constitute [] an outlier for the purpose of [NJ]EDA disqualifications for tax incentives."

9

As we have already noted, Holtec was awarded $260 million in tax credits to be released over ten years. It invested more than that amount to build the campus in Camden. As part of its agreement with NJEDA, Holtec agreed to submit yearly compliance reports. On January 15, 2018, Holtec submitted its first Annual Compliance Report for the 2017 tax year. On April 11, 2018, NJEDA certified Holtec's compliance.

On January 15, 2019, Holtec submitted its Annual Compliance Report for the 2018 tax year. On May 20, 2019, Holtec sent a letter to NJEDA updating its answer to the "Debarment/Disqualification" question. Holtec answered "yes" to Item 8 and provided details about its ten-day debarment by TVA. Holtec did not receive a letter of compliance from NJEDA for the 2018 tax year, nor did it receive the associated tax credits. The Authority's stated reason for withholding the tax credits was Holtec's failure to disclose its 2010 debarment by TVA and Holtec's misleading statements about "alleged alternative sites in South Carolina."

On March 23, 2020, Holtec filed a complaint against NJEDA, asserting claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and equitable estoppel. NJEDA moved to dismiss the complaint. On August 4, 2020, Judge Mary C. Jacobson granted the motion in part by

dismissing Holtec's equitable estoppel claim but denied the motion to dismiss the other counts.

After discovery was completed, both parties moved for summary judgment. Judge Lougy denied NJEDA's motion for summary judgment and granted Holtec's motion. He ordered NJEDA to issue a letter of compliance approving the issuance of tax credits to Holtec for the 2018 tax year.

This appeal follows.[1] NJEDA contends the trial court erred in concluding, on summary judgment, that Holtec did not make material misrepresentations about its debarment or about its supposed alternate site in South Carolina.

II.

We begin our analysis by acknowledging the legal principles governing this appeal. As a general proposition, summary judgment is only appropriate where no "genuine issue of material fact exists." Friedman v. Martinez, 242 N.J. 449, 472 (2020). When evaluating a summary judgment motion, "the trial court must 'draw[] all legitimate inferences from the facts in favor of the non-moving party.'" Ibid. (quoting Globe Motor Co. v. Igdalev, 225 N.J. 469, 480 (2016)).

---

[1] Holtec filed a protective cross-appeal. In light of our decision to affirm the grant of summary judgment in Holtec's favor, we need not address the arguments raised in Holtec's cross-appeal.

Appellate review of the trial court's summary judgment decision is de novo. Branch v. Cream-O-Land Dairy, 224 N.J. 567, 582 (2021). On appeal, we consider "'whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.'" Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 406 (2014) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)).

As Judge Lougy observed, "[t]he parties agree that no material facts are in dispute." Rather, this case hinges on the interpretation of the contract between NJEDA and Holtec and the completed application form that culminated in the agreement. "The interpretation or construction of a contract is usually a legal question for the court, 'suitable for a decision on a motion for summary judgment.'" Driscoll Constr. Co. v. State, Dep't of Transp., 371 N.J. Super. 304, 313-14 (App. Div. 2004) (quoting Spaulding Composites Co., Inc. v. Liberty Mut. Ins. Co., 346 N.J. Super. 167, 173 (App. Div. 2001), rev'd on other grounds, Spaulding Composites Co., Inc. v. Aetna Cas. & Sur. Co., 176 N.J. 25, 46 (2003)).

In contract disputes, the State "must 'turn square corners' rather than exploit litigational or bargaining advantages that might otherwise be available to private citizens." W.V. Pangborne & Co., Inc. v. N.J. Dep't of Transp., 116 N.J. 543, 561 (1989) (quoting F.M.C. Stores Co. v. Borough of Morris Plains, 100 N.J. 418, 426 (1985)). The government must act fairly and "adhere to strict standards in its contractual dealings," while also acting consistently with its "supervening obligation . . . to deal scrupulously with the public." Id. at 562.

"'An ambiguity in a contract exists if the terms of the contract are susceptible to at least two reasonable alternative interpretations. . . .'" Nester v. O'Donnell, 301 N.J. Super. 198, 210 (App. Div. 1997) (quoting Kaufman v. Provident Life & Cas. Ins. Co., 828 F. Supp. 275, 282 (D.N.J. 1992), aff'd, 993 F.2d 877 (3d Cir. 1993)). Whether a provision is ambiguous is a matter of law. Schor v. FMS Fin. Corp., 357 N.J. Super. 185, 191 (App. Div. 2002). Where the government is a party to and the drafter of a contract, any ambiguity is "strictly construed against . . . the government entity." M.J. Paquet, Inc. v. N.J. Dep't of Transp., 171 N.J. 378, 398 (2002).

III.

Applying these legal principles, we first address NJEDA's interrelated contentions with respect to Holtec's failure to reveal its ten-day debarment by

TVA. The Authority contends the trial judge erred by determining at summary judgment that the Grow Program application was ambiguous with respect to past debarment; erred by not applying the doctrine of "patent ambiguity"; and erred by not considering other evidence of Holtec's intentions. The gist of these arguments is that Holtec made a material misrepresentation in its Grow Program application, and that Judge Lougy erred in finding otherwise.

Judge Lougy ruled that Item 8 of the "Additional Background Information" section of the Grow Program application was ambiguous. He "construe[d] the contested clause against the NJEDA" because "NJEDA drafted the application." NJEDA "did not specify its intent and it provided no instructions or guidance to the applicants." Judge Lougy noted the debarment portion of the application could be interpreted in multiple ways. He explained,

> [o]ne potential interpretation is NJEDA intended for applicants to answer the question including all past and current debarments regardless of relevant legal proceedings. A second interpretation is NJEDA required an affirmative response only if the applicant was currently debarred. An additional interpretation is an affirmative response was only necessary if the applicant was previously found guilty, liable, or responsible in any legal proceeding.

Judge Lougy also found that NJEDA knew this portion of the application was ambiguous based on other applicants' feedback. He noted deposition

testimony by NJEDA employees showed the Authority had already determined debarments were only relevant if they applied to the members of the applicant's "control group." Judge Lougy concluded,

> [u]nder that interpretation, a 'no' answer from [Holtec] would be accurate and render this issue moot. It is not clear that, at the time [Item] No. 8 was drafted, [NJEDA] even understood the type of information it hoped to learn. Accordingly, the [c]ourt declines to hold that ambiguity against [Holtec].

Judge Lougy added that Holtec was not trying to conceal its ten-day debarment from the Authority. He reasoned it was implausible that Holtec would attempt to conceal this public information, which is accessible on the internet. Holtec also assented to a background check as part of its Grow Program application.[2]

Although we review these issues de novo, considering all relevant circumstances, we agree with Judge Lougy that NJEDA was not entitled to void the incentive agreement based on Holtec's answer in the negative to Item 8. The determination of an ambiguity in a contract is a question of law, and thus appropriate for resolution by summary judgment. See Schor, 357 N.J. Super. at 191. We apply that principle to the application form that led to the execution of

---

[2] There is no indication in the record that NJEDA ever conducted a background check.

the agreement. Furthermore, where, as in this instance, the government is a party to and drafter of a contract, any ambiguity is "strictly construed against . . . the government entity." M.J. Paquet, 171 N.J. at 398.

We also agree with Judge Lougy that the patent ambiguity doctrine does not apply to Holtec's application since there is no bidding process in the NJEDA Grow Program. In brief, the patent ambiguity doctrine states "in construing a public contract a contractor has an obligation to alert the public entity to possible errors in a contract before bidding on it." Dugan Constr. Co., Inc. v. N.J. Tpk. Auth., 398 N.J. Super. 229, 241 (App. Div. 2008). To ensure equality for all bidders, "contractors are urged" to examine all documents and "raise questions about the drawings, specifications and conditions of bidding and performing the work." Ibid. Patent ambiguity in publicly bid contracts is an "exception to the general rule that a contract, and any latent ambiguities in it, should be construed against the party that wrote it." Ibid. The onus is shifted from the government to the bidder "by requiring that ambiguities be raised before the contract is bid on, thus avoiding costly litigation after the fact." Ibid.

Moreover, at the risk of stating the obvious, the concept of materiality presupposes that a positive answer to Item 8 would have mattered. But the NJEDA employee who was responsible for preparing recommendations and

reports candidly acknowledged that Grow Program applications were granted to companies with histories of far more serious transgressions. It thus seems unlikely that Holtec's application would have been denied had it revealed in its initial application that it once had a ten-day debarment in another state.

In sum, given the application form deficiencies and the manner in which NJEDA oversaw the application process, Holtec's negative response to Item 8 in its initial application does not constitute a material misrepresentation that might warrant rescinding the award of tax credits.

IV.

We turn next to NJEDA's contention the trial court erred by ruling that plaintiff did not materially misrepresent an offer of free land in South Carolina. Judge Lougy concluded there were no material misrepresentations because Grow Program applicants were asked only to make estimates about costs of acquiring alternate sites. Holtec "consistently and explicitly referred to land costs as assumptions." Judge Lougy stressed that NJEDA "did not seek or request any additional documentation regarding land costs."

Furthermore, Judge Lougy found, based on the deposition testimony of NJDEA employees or former employees, "that, given the magnitude of the project and the higher costs associated with construction in New Jersey, land

costs were not a material factor in NJEDA's approval of [Holtec's] application." Finally, Judge Lougy emphasized "[t]he record shows [NJEDA] intentionally chose not to request written agreements [regarding land costs] from Grow Program applicants because it did not 'want to push the companies to another state to start engaging in further dialogue with them. . . .'" Judge Lougy concluded that because Holtec did not make misrepresentations as to land acquisition, NJEDA was not entitled to void the incentive agreement.

We are unpersuaded by NJEDA's argument that these issues need to be decided at a trial rather than by summary judgment. The law is well-settled that summary judgment is appropriate "when the evidence 'is so one-sided that one party must prevail as a matter of law,' . . . the trial court should not hesitate to grant summary judgment." Brill, 142 N.J. at 540 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)). The record amply supports Judge Lougy's findings. We reiterate and emphasize NJEDA's own employees testified they did not press applicants for written offers from other states as a matter of policy. Judge Lougy's well-supported finding that NJEDA never asked for anything more than assumptions about alternative site costs forecloses a finding that Holtec made material representations. As Judge Lougy aptly

concluded, Holtec supplied NJEDA with exactly what it asked for in the application.

V.

We turn finally to NJEDA's contentions with respect to the remedy of recission. NJEDA challenges Judge Lougy's conclusion that recission would be an inequitable remedy, arguing in its reply brief that it is contractually entitled to this relief.

"Rescission is an equitable remedy and only available in limited circumstances." Intertech Assocs., Inc. v. City of Paterson, 255 N.J. Super. 52, 59 (App. Div. 1992). Rescission is one possible remedy available, for example, when a contract is induced by fraud. Ajamian v. Schlanger, 20 N.J. Super. 246, 249 (App. Div. 1952). "Even where grounds for rescission exist, however, the remedy is discretionary." Intertech, 255 N.J. Super. at 59 (citing Hilton Hotels Corp. v. Piper Co., 214 N.J. Super. 328, 336 (Ch. Div. 1986)). When a party discovers fraud within a contract, "he must thereupon act with diligence and without delay if he desires to rescind. . . ." Ajamian, 20 N.J. Super. at 249. Importantly for purposes of this appeal, for rescission to be available, "[t]he court must be able to return the parties to the 'ground upon which they originally

stood.'" Intertech, 255 N.J. Super. at 59 (quoting Driscoll v. Burlington-Bristol Bridge Co., 28 N.J. Super. 1, 14 (App. Div. 1953)).

We agree with the trial judge that recission is not an appropriate remedy in this case. For one thing, as Judge Lougy aptly noted, no fraud occurred here. The ambiguity associated with the application form NJEDA drafted excuses any omissions in Holtec's completed application.

Furthermore, as Judge Lougy stressed, Holtec relied on the tax credits in deciding to make a very significant investment in New Jersey by relocating to Camden as the Authority requested. Considering Holtec's significant investment in the new technology campus, there is no way to return the parties to their pre-contract positions. We add that NJEDA continues to benefit from Holtec's ongoing performance. We can appreciate why NJEDA is strongly motivated to make amends for its past lack of diligence in overseeing the Grow Program, as claimed in the State Comptroller's report. We appreciate why NJEDA is motivated to respond to the State Comptroller's criticism of its administration of the Grow Program. However, rescinding tax credits to a company that dutifully fulfilled its agreement to make substantial investments in Camden—an economically disadvantaged city—would hardly be equitable considering all relevant circumstances.

20

In sum, we conclude this matter was ripe for summary judgment. The Judge Lougy's comprehensive decision is well supported by the undisputed facts in the record.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1477-21