133 N.J. Super. 503 (1975)
337 A.2d 621
EDWARD D. LORD, INC., A NEW JERSEY CORPORATION, PLAINTIFF-APPELLANT,
v.
MUNICIPAL UTILITIES AUTHORITY OF THE TOWNSHIP OF LOWER, CAPE MAY COUNTY, AND STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued April 15, 1975.
Decided April 29, 1975.
*504 Before Judges MATTHEWS, FRITZ and BOTTER.
Mr. Lee M. Hymerling argued the cause for appellant (Messrs. Archer, Greiner & Read, attorneys).
Mr. William M. Balliette, Jr. argued the cause for respondent Municipal Utilities Authority of the Township of Lower, Cape May County (Messrs. Cafiero & Balliette, attorneys).
Mr. Lawrence E. Stanley, Deputy Attorney General, argued the cause for respondent State of New Jersey (Mr. William F. Hyland, Attorney General of New Jersey, attorney).
The opinion of the court was delivered by BOTTER, J.A.D.
*505 This is a unique case in which plaintiff Edward D. Lord, Inc. (Lord) sues to recover the full amount of a contract made with defendant Municipal Utilities Authority of the Township of Lower (M.U.A.) for the construction of a sewerage treatment plant. Defendant counterclaimed for a relatively small amount representing an alleged overpayment made to plaintiff. Damages were stipulated, depending upon the resolution of the liability issue. From a judgment in favor of defendant plaintiff has taken this appeal. Although we concur in the result reached by the trial judge and in much of his reasoning (128 N.J. Super. 43), we will set forth briefly our own rationale in affirming the judgment.
The essential facts are set forth in detail in the trial court's opinion. A synopsis may be composed based largely on plaintiff's own assertions. Two general contractors, Lord and Edward Ellis, Inc., submitted competitive bids. Each had received quotations for the electrical work from proposed subcontractors, Audubon Electric and Anchor Electric (the successor of Martin Electric Company). Audubon and Anchor had secretly agreed to "cross" excessive estimates, so that one quoted $312,000 to Lord and $318,400 to Ellis and the other quoted $318,400 to Lord and $312,000 to Ellis. Thus, both Lord and Ellis were able to compute their total bids in reliance upon an identical low estimate of $312,000, received from Audubon in one case and from Anchor in another.
As the low bidder on the project, Lord was awarded the general contract. Lord, in turn, gave the electrical subcontract to Audubon at a reduced negotiated price. (Although Lord had received the lower estimate from Anchor, Lord decided against Anchor since it had just come out of bankruptcy and Lord's bonding company recommended against dealing with its principal officer.)
Shortly after being awarded the contract Walter Smith, who owned and operated Audubon, was killed in an airplane crash. Thereafter Audubon came under the control of individuals *506 who were formerly connected with Anchor, and Audubon could not furnish a performance bond. Lord rebid the electrical work and obtained substantially lower bids. This led to the discovery of the Audubon and Anchor complicity of which Lord was completely innocent. Lord had previously furnished to M.U.A. a breakdown of estimated costs for the various portions of the work, including the electrical work, which were included in its lump sum bid, so that M.U.A.'s engineers could approve periodic payments. This breakdown allocated $294,600 to the electrical work. After rebidding the electrical work Lord advised the engineers of the new contract price and of the discovery of the collusive bidding tactics of Audubon and Anchor. The new contract price for the electrical work was approximately $113,000 less than the estimate upon which Lord's bid to the Authority was based.
A public agency cannot change the contract price simply because the successful bidder can obtain materials or services from subcontractors at a lower cost than initially estimated. The bidder assumes the risk of an increase in costs and is entitled to the benefits of any decrease he can obtain.
In this rare case, however, a more flexible approach seems warranted, even though Lord was innocent of the fraud committed by the subcontractors who furnished the collusive estimates. The bidding statutes are designed to protect the public through fair and open competitive bidding, and to protect bidders as well. See Arthur Venneri Co. v. Paterson Housing Auth., 29 N.J. 392, 403 (1959). Here, however, the purpose of the law was undermined by two subcontractors upon whom the competing bidders relied. In this situation only the public was exposed to a loss. Neither bidder was exposed to risk of loss, nor was the disparity between the bids affected by the estimated cost of the electrical component. The only question is whether reformation of the contract can be invoked as a judicial remedy, as requested by defendant, to prevent injury to the public. In this instance *507 we believe the ancient remedy of reformation may be employed to rectify the error resulting from a mutual mistake of a material fact on which both parties relied in determining the price of the contract award. It makes no difference that the mistake was brought about by the fraud of other parties. Both parties to this contract, Lord and the M.U.A., assumed, as the law intended, that the bididng was fair and not "rigged." The price that was agreed upon was believed by both parties to reflect this essential premise. But this was not the case. The bids of both competitors for the general construction contract were artificially inflated by the collusive conduct of the two electrical contractors whom they consulted. The result was an injury to M.U.A. and the public. Denial of relief would yield a benefit to plaintiff beyond the contemplation of the parties in the formation of the contract.
This circumstance would have justified rejection of bids or rescission of the contract, had the fraud been discovered before the work commenced and before the parties had changed positions. Cf. Armaniaco v. Cresskill, 62 N.J. Super. 476, 484 (App. Div. 1960). As noted in Hillside Tp. v. Sternin, 25 N.J. 317 (1957):
The purpose [of public bidding laws] is to secure competition and to guard against favoritism, improvidence, extravagance and corruption. Statutes directed toward these ends are for the benefit of the taxpayers and not the bidders; they should be construed with sole reference to the public good * * *. [at 322]
Reformation of a contract will be granted to rectify a mutual mistake. Dover Farms, Inc. v. American Air Lines, Inc., 111 N.J. Super. 276 (App. Div. 1970), certif. den. 57 N.J. 140 (1970); Brodzinsky v. Pulek, 75 N.J. Super. 40, 47-48 (App. Div. 1962), certif. den. 38 N.J. 304 (1962); cf. Heake v. Atlantic Cas. Ins. Co., 15 N.J. 475, 481 (1954). The problem normally arises when the agreement fails to specify correctly the terms that the parties agreed upon, such as where a deed absolute on its face was actually intended as a mortgage. See Brodzinsky v. Pulek, *508 supra. But the principle of granting relief from a mutual mistake should be applied in this case as well to implement the legislative policy which envelopes these contracts.
Under public bidding laws a contractor may, in appropriate circumstances be relieved of his undertaking even for a unilateral mistake, if it is of a serious nature. Cataldo Construction Co. v. Essex Cty., 110 N.J. Super. 414 (Ch. Div. 1970); Conduit & Foundation Corp. v. Atlantic City, 2 N.J. Super. 433 (Ch. Div. 1949); see Annotation, "Rights and remedies of bidder for public contract who has not entered into a contract, where bid was based on his own mistake of fact or that of his employees," 52 A.L.R.2d 792 (1957); cf. Edelstein v. Asbury Park, 51 N.J. Super. 368, 389-392 (App. Div. 1958). It is not in the public interest to hold a bidder to a contract which would compel performance at a substantial loss due to a serious error in his bid proposal. Here, as well, where the injury would fall on the public and may be remedied without loss to the contractor, equitable relief in the form of reformation may be invoked in favor of the public authority.
Affirmed.