245 N.J. Super. 527 (1991)
586 A.2d 301
D'ANNUNZIO BROTHERS, INC., A NEW JERSEY CORPORATION, PLAINTIFF-APPELLANT,
v.
NEW JERSEY TRANSIT CORPORATION, SEELYE, STEVENSON, VALUE & KNECHT; DANIEL, MANN, JOHNSON & MENDENHALL; MORRISON-KNUDSEN, PARSONS BRINCKERHOFF, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 28, 1990.
Decided January 28, 1991.
*529 Before Judges KING, LONG and R.S. COHEN.
Charles E. Starkey argued the cause for appellant (Starkey, Kelly, Blaney & White, attorneys, Charles E. Starkey on the brief).
Michael J. Gonnella, Deputy Attorney General, argued the cause for respondent New Jersey Transit Corporation (Robert J. Del Tufo, Attorney General, attorney, Andrea M. Silkowitz, Assistant Attorney General, of counsel and Michael J. Gonnella on the brief).
*530 John S. Favate argued the cause for respondents Seelye, Stevenson, Value & Knecht/Daniel, Mann, Johnson & Mendenhall (Bumgardner, Hardin & Ellis, attorneys, William R. Bumgardner of counsel and John S. Favate on the brief).
Michael A. Sicola argued the cause for respondents Morrison-Knudsen/Parsons Brinckerhoff (Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski, attorneys, Michael A. Sicola of counsel).
The opinion of the court was delivered by R.S. COHEN, J.A.D.
Plaintiff, D'Annunzio Brothers, Inc. (DBI) is a contractor which performed construction work for defendant New Jersey Transit Corporation (NJT) at its rail equipment maintenance facility in Kearny. Defendant Seelye, Stevenson, Value & Knecht/Daniel, Mann, Johnson & Mendenhall (SSVK/DMJM) is an engineering joint venture which prepared the technical bidding and contract documents for NJT. Defendant Morrison Knudsen/Parsons, Brinckerhoff (MK/PB) is a joint venture which served as NJT's construction manager.
DBI's action against NJT was for some $1.1 million allegedly owed for roughly 11,000 cubic yards of excavation and fill for which DBI said it should have been paid on a unit-price basis. The claim against SSVK/DMJM was for professional engineering negligence in preparing ambiguous specifications, in the event it turned out that NJT did not have to pay DBI under the contract. The charge against MK/PB was bad faith denial of DBI's claim in its contractual role of ruling on such claims. Defendants filed the appropriate crossclaims against one another.
Defendants moved for summary judgment. Law Division Judge Jared D. Honigfeld found that there was no material fact in dispute, and ruled that all of the defendants were entitled to judgment as a matter of law. We agree, and therefore affirm.
*531 NJT is an instrumentality of the State, created by the New Jersey Public Transportation Act of 1979 to further the State goal of providing an efficient, coordinated, safe, coherent and responsive public transportation system. N.J.S.A. 27:25-2. Its contracts are made only after public advertisement for bids in the manner of other public bodies. N.J.S.A. 27:25-11. In 1984, NJT advertised for bids for site grading, drainage and utility work at the Kearny facility. The work described in the bid documents was complex and detailed. Among other things, it included the installation of hundreds of concrete structures, each of which involved excavation of soil materials and backfilling after installation.
The bid documents were supplied to prequalified prospective bidders in October 1984, and a site inspection and prebid conference was held that month in order to permit bidders to become familiar with the project and raise questions about work conditions, contract terms and specifications. In at least two places, the bid documents advised the bidders to seek prebid correction or clarification by NJT of any perceived contract, drawing or specification obscurities, errors, or discrepancies.
Before submitting DBI's bid for the November 28 bid opening, DBI's chief estimator, who prepared the bid, was aware of an apparent discrepancy regarding the amount of excavation and backfill involved in the contract and the method of paying for it. There were two separate unit-price bid items, for structure excavation and structure backfill, which NJT estimated at a total of 90 yards. DBI says it read the items as including the excavation and backfill for all of the hundreds of structures involved in the contract, even though DBI recognized that the estimate of 90 yards would have been wildly inaccurate for all of the work. (These are the items DBI eventually billed at over 11,000 yards.) DBI submitted the unit price bid of $100 per yard, a multiple of the unit price predicted to NJT by SSVK/DMJM.
*532 Another possible reading of the bid documents was that the cost of excavation and backfill associated with each of the many structures to be installed was to be included in the costs calculated for each structure, and that the separate 90-yard item was for a particular structure in an area where work by another contractor made impossible any accurate estimate of the amount of necessary earth work, and thus made reasonable the requirement for a unit-price bid.
DBI unilaterally rejected this interpretation even though the chief estimator and the company president recognized the discrepancy before submitting the bid, and considered it to be an error on NJT's part. DBI's project manager independently discovered it and discussed it with the chief estimator before signing the actual contract with NJT. He did not mention it to NJT, however, until just after NJT signed the contract which DBI had earlier signed. And, when the project manager was told that NJT disagreed with DBI's interpretation, and would not make unit-price payments for all of the excavation and backfill, DBI went ahead with contract performance, and billed extra for the disputed work in anticipation of this lawsuit.
Before the bids were opened, SSVK/DMJM estimated the total contract was worth some $6,58 million. DBI's low bid was about $6.72 million. The second and third low bids were $6.94 million and $6.98 million. DBI's claim is that it was caused by the ambiguous specifications to underbid the contract by $1.1 million.
This is not a private contract, but one involving a governmental instrumentality. Such contracts must be let only after the broadest opportunity for public bidding is given in order to secure competition, and guard against favoritism, improvidence, extravagance and corruption. Hillside Tp. v. Sternin, 25 N.J. 317, 322, 136 A.2d 265 (1957). An essential element of the bidding process is a common standard of competition. To that end, the conditions and specifications must apply equally to all prospective bidders, thus permitting the *533 contractors to prepare their bids on the same basis. Id. It is to assure a level playing field that contractors are urged in bid documents to examine the documents thoroughly, make site visits, attend prebid conferences, and raise questions about the drawings, specifications and conditions of bidding and performing the work. To every possible extent, such questions should be addressed before bid opening.
A necessary part of this salutary approach to public contracting is the doctrine of patent ambiguity, which has become a well-known principle of federal government contract law. See Collins Int'l Serv. Co. v. United States, 744 F.2d 812, 814 (Fed. Cir.1984). The doctrine is equally valid in the context of publically bid contracts in New Jersey, and therefore should be applied to such contracts.
The doctrine of patent ambiguity is an exception to the general rule that a contract, and any latent ambiguities in it, should be construed against the party that wrote it. Newsom v. United States, 676 F.2d 647, 649, 230 Ct.Cl. 301 (1982); cf. United States v. Turner Constr. Co., 819 F.2d 283 (Fed. Cir.1987). The doctrine has been described and explained by the United States Court of Claims:
If a patent ambiguity is found in a contract, the contractor has a duty to inquire of the contracting officer the true meaning of the contract before submitting a bid. This prevents contractors from taking advantage of the Government; it protects other bidders by ensuring that all bidders bid on the same specifications; and it materially aids the administration of Government contracts by requiring that ambiguities be raised before the contract is bid on, thus avoiding costly litigation after the fact.
Newsom, 676 F.2d at 649. The existence of a patent ambiguity creates the duty to inquire of the public body or of whomever it may designate to receive inquiries. A contractor who fails to inquire into a patent ambiguity may not successfully make a claim for contract payments based on the contractor's interpretation of the ambiguous language of the contract, no matter how reasonable its interpretation may be. Fortec Constructors *534 v. United States, 760 F.2d 1288, 1291 (Fed. Cir.1985); Newsom, 676 F.2d at 650.
An ambiguity is a patent one if it is one which either (1) would have been apparent to reasonable prospective bidders from the facts available, HRH Constr. Corp. v. United States, 428 F.2d 1267, 1271, 192 Ct.Cl. 912 (1970); Newsom, 676 F.2d at 649, or (2) was in fact known to the contractor before submitting its bid. In the present case, DBI admittedly was fully aware of the discrepancy on which it now bases its claim. It omitted to make timely inquiry, despite instructions to do so contained in the bid documents. We therefore conclude that Judge Honigfeld properly employed the patent ambiguity doctrine to enter summary judgment dismissing DBI's claim against NJT.
DBI's claim against SSVK/DMJM was also dismissed. It was a claim for professional negligence, but was presented without any supporting expert opinion or factual material upon which SSVK/DMJM could be found negligent in performing its function of producing technical bid documents. On that basis, Judge Honigfeld properly dismissed the claim.
We need not decide if the patent ambiguity doctrine should extend to bar a contractor's suit against the engineer who prepared the ambiguous specifications, on the thesis that proper contractor behavior would have avoided any damages.
DBI's claim against MK/PB was also dismissed. It was a claim that as NJT's construction manager MK/PB made an arbitrary and capricious decision in denying DBI's claim. Because we have concluded that the claim against NJT was properly denied, DBI's cause of action that attacks MK/PB's decision to that effect must fail. We need not decide if the absence of expert testimony or a qualified judicial immunity would compel the same result.
Affirmed.