941 A.2d 622 (2008)
398 N.J. Super. 229
DUGAN CONSTRUCTION COMPANY, INC., Plaintiff-Appellant
v.
NEW JERSEY TURNPIKE AUTHORITY, Defendant-Respondent, and
Camp, Dresser & McKee, Inc., and URS Corporation, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued January 28, 2008.
Decided February 29, 2008.
*623 I. Michael Heine, argued the cause for appellant (Heine Associates, attorneys, Cherry Hill; Mr. Heine, on the brief; Mary Ann Hallenborg, New York City, of counsel and on the brief).
William J. Linton, Woodbridge, argued the cause for respondent (Wilentz Goldman & Spitzer, attorneys; Mr. Linton and Jon S. Polevoy, of counsel and on the brief).
Before Judges S.L. REISNER, BAXTER and KING.
The opinion of the court was delivered by
S.L. REISNER, J.A.D.
Plaintiff Dugan Construction Co., Inc. (Dugan) appeals from a February 21, 2007 order of the trial court granting summary judgment dismissing plaintiffs complaint against defendant New Jersey Turnpike Authority (NJTA).
*624 This case arises from a contract between Dugan and NJTA for remediating polluted groundwater. Dugan claimed $9.5 million for disposing of approximately 200,000 gallons of non-hazardous wastewater, although its bid of fifty dollars per gallon was based on NJTA's estimate that the project would produce only fifty-five gallons of wastewater. The trial judge dismissed Dugan's complaint based on the doctrine of patent ambiguity. We conclude that the contract estimate was a mistake, rather than an ambiguity, and that the correct remedy is reformation of the contract. Based on undisputed evidence concerning the reasonable price of disposal, we order that the contract be reformed to provide Dugan compensation of $52,330.

I
These undisputed facts are drawn from the record before the trial court.[1] On July 18, 2000, NJTA issued an advertisement inviting proposals for a contract that required remediation of soil and groundwater at the James Fenimore Cooper Service Area, located at exit 4N on the New Jersey Turnpike.
The proposed contract included both the excavation and removal of contaminated soil and the remediation of polluted groundwater. The specifications required that one of two possible remediation techniques be employed for the groundwater: "water jetting" or the "surging and pumping" method. The specifications provided a detailed description of the procedures for each method. Under the jetting method, the specifications required the contractor to maintain a uniform jetting of forty gallons per minute (gpm) for seventeen groundwater excavation wells. The specifications further required that the "well development" water from the extraction wells be stored in tanks on-site and then be trucked to a disposal site. However, the contractor was not responsible for the cost of disposal; the NJTA was to pay the municipal utilities authority for the cost of disposing of the water.
The specifications included a "Scheduled Items of Work" form that required bidders to submit unit prices for thirty-seven scheduled items of work. Many items of work were described in terms of approximate quantities. For example, for "Transportation and Disposal of Contaminated SoilNon Hazardous," the form listed 250 tons, and Dugan bid $100 per ton. Dugan bid $400 per ton for transportation and disposal of "Contaminated SoilHazardous." Item 28, which is at issue in this case"Storage, Handling and Transportation of Liquid WastesNon-Hazardous" listed an approximate quantity of fifty-five gallons, for which Dugan bid $50 per gallon, for a total estimated price of $2750. Notably, for item 29 on the list, "Storage, Handling and Transportation of Liquid Wastes-Hazardous," Dugan bid $4 per gallon to dispose of a projected 2200 gallons.
The contract also included the New Jersey Turnpike 1987 Standard Specifications (the specifications), which detailed how the work was to be performed. Subsection 102.06 of the specifications, titled "Approximate Quantities," provided the following:
The quantities of the several Scheduled Items of Work involved in the performance of the Project and stated in the Proposal are estimates only and the actual quantities may be greater or less, or items may be eliminated entirely. Payment will be made only for the actual *625 quantity of authorized work performed under each Scheduled Item.
The contract required bidders to examine, the bid documents and bring ambiguities or errors to the attention of the Chief Engineer on the project:
Prospective Bidders must examine the Contract Documents carefully before bidding and must request the Chief Engineer in writing for an interpretation or correction of every apparent ambiguity, inconsistency or error therein.
. . . .
If the Bidder, prior to the submission of his bid, fails to call the Chief Engineer's attention to the existence of any apparent ambiguity, inconsistency or error in the Contract Documents, his Bid will be conclusively presumed to have been based upon the interpretation of such ambiguity or inconsistency, or the directions correcting such error, which may subsequently be given [by] the Engineer.
Section 1.4.9 also provided that the contractor "shall verify all field conditions as affect his work, and shall report to the Engineer any errors, discrepancies or inconsistencies in the Specifications or Plans, and shall await instructions before proceeding with the work." Section 1.3.3 permitted the Chief Engineer to "make changes in the Plans and Specifications at any time by a written order" and provided that if a change involved an increase of more than 25% of a projected quantity, and a cost increase "amounting to . . . more than 25% of the total cost of the project," the increased work would be subject to a negotiated price.
Plaintiff proposed a total bid of $1,696,000, which. NJTA accepted, and the contract was signed by both parties on October 11, 2000. NJTA also contracted with Camp, Dresser & McKee (CDM) and URS Corporation (URS) for this project. CDM was hired to perform design services, and URS was hired to act as an authorized representative of NJTA's Chief Engineer for the project.[2] In that, capacity, URS provided site inspectors on the job.
Initially, plaintiff elected the surging and pumping method when it bid $50 per gallon. Before commencing the work, Dugan decided to subcontract the groundwater removal. On December 5, 2000, Carl Zeroski of Dugan obtained a proposal from the subcontractor, JCA Associates, for the two methods of water remediation allowed by the contract. JCA's estimate for the surging and pumping method called for pumping and removal of 42,840 gallons of water at a basic cost of $26,150, with a possible addition of $5500 if the holding tanks ("frac tanks") were located more than 100 feet from the well heads. For the water jetting method, JCA estimated the need to remove 255,680 gallons of water at a basic price of $57,065. On December 15, 2000, Zeroski sent notice to the URS site inspector that Dugan would use the water jetting method. Dugan arranged with JCA to perform the work, and, on December 21, 2000, Dugan applied to the Mount Holly municipal utilities authority (MUA) to bring up to 200,000 gallons of wastewater to the MUA for disposal.
Dugan did not copy the NJTA on its correspondence to the MUA. Nor did Zeroski's faxed letter of December 15, 2000 to the site inspector, Romulus Celan of *626 URS, notifying Celan that Dugan would "utilize the Water Jetting method," make any mention of the increase in water quantities that this would entail.
Indeed, there is no dispute on this record that although Dugan knew as early as December 5, 2000, that the NJTA contract's fifty-five gallon estimate for disposal of wastewater must have been an error, or at least a gross underestimate, Dugan did not bring this to the attention of the Chief Engineer.[3] Carl Zeroski admitted this in his deposition. When asked "did you or anyone from Dugan say we think we're going to overrun this quantity by X gallons?" Zeroski replied "No, I don't think any anyone ever said we're going to overrun by X gallons." He also admitted that Dugan did not convey to NJTA the information given to the MUA, that Dugan intended to dispose of 200,000 gallons of wastewater.
Instead, without giving advance notice of the contract error to the NJTA, Dugan proceeded to pump thousands of gallons of water into and out of the wells. The pumping work began on December 20, 2000, shortly before the Christmas holidays, and was completed by January 4, 2001, although the last of the contaminated water was not trucked off the site until January 12. Zeroski's contention at his deposition was that during this time, Dugan provided daily well logs to a site inspector, who signed the logs and should have figured out that Dugan was exceeding the contracted quantities of wastewater.[4] It is clear from the October 13, 2005 certification of Thomas R. Dugan that this was also his contentionthat the well logs were Dugan's only "notice" to NJTA of the overrun.
As a result, the Chief Engineer had no meaningful opportunity to create in advance the necessary change order, which would have dramatically modified the quantities of wastewater to be disposed of, and triggered the 25%-overage and negotiated-price sections of the contract. Zeroski admitted that after the work was completed in January, he was asked to submit a proposed change order for the water disposal and that he did submit a proposed change order to engineer Ralph Fasano.
At his deposition, Zeroski also admitted his understanding that the jetting method put water into the wells at the rate of forty gallons per minute. But when asked "Do you believe that the water put into the well through jetting which was not groundwater is payable under item 28?" he contended, "I believe it is, yes." Thus, much of the water disposed of through the jetting method was not actually groundwater, but rather was water pumped into the well to clear out sand and other "fine" material, until the well water was clear. The jetted water was then pumped back out into frac tanks and trucked to the MUA for disposal. The MUA's disposal bill was paid by NJTA, not by Dugan.
Under the estimate it received from its subcontractor JCA, Dugan was to pay JCA a maximum of $57,000 for the wastewater pumping and disposal. However, after the work was done, Dugan demanded that *627 NJTA pay $50 per gallon for disposing of approximately 200,000 gallons of non-hazardous wastewater at a total cost of over $9.5 million.
In support of its summary judgment motion, NJTA submitted an expert report from Frank Renda, a licensed professional engineer and President of FD Renda Engineering & Construction, Inc. According to Renda, based on his estimates, the fair value of the additional water disposal work was twenty-eight cents per gallon, or $52,330. Renda also opined that Dugan "as an experienced and prudent contractor, was aware, or should have been aware" at the time it submitted its bid that the contract documents had underestimated the amount of groundwater to be disposed. However, instead of reporting the error, "Dugan unbalanced, its bid in an attempt to reap unreasonable profits from the Turnpike."
Dugan did not submit an expert report in opposition to Renda's report. Thomas Dugan's September 13, 2005 affidavit, describing what was involved in the water disposal operation, did not quantify or even address the true cost of performing the work. He merely asserted that the NJTA's failure to pay his company the unit price of $50 per gallon was "unfair and inequitable."
In support of its cross-motion for summary judgment, NJTA submitted a fax dated February 12, 2001, from Tom Laustsen of CDM to Ralph Fasano of URS. Laustsen indicated that "[w]e could have expected 600 to 1000 gallons per well pumping and surging."
In a six-page written opinion, the motion judge concluded that the contract contained a "patent ambiguity" concerning the amount of wastewater to be disposed of. See D'Annunzio Bros., Inc. v. New Jersey Transit Corp., 245 N.J.Super. 527, 586 A.2d 301 (App.Div.1991). The ambiguity obligated Dugan to inquire as to whether the estimated quantity in the contract was an error, failing which it could not collect payment based on its construction of the contract. The judge also reasoned that "[e]ven if the doctrine of patent ambiguity did not apply this would be a contract ripe for reformation." See Lord v. Mun. Util. Auth. of Lower Twp., 133 N.J.Super. 503, 337 A.2d 621 (App.Div.1975). He also considered that the principles underlying the doctrine of rescission were analogous, in that a public entity might be entitled to equitable relief even for a unilateral mistake if enforcing the contract would result in an unconscionable windfall to the contractor. See Intertech Assocs., Inc. v. Paterson, 255 N.J.Super. 52, 604 A.2d 628 (App.Div.1992).

II
On appeal, we engage in de novo review of the trial court's grant of summary judgment, using the same standard the trial court is to employ. See Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App.Div), certif. denied, 154 N.J. 608, 713 A.2d 499 (1998); Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). Having reviewed the record, we conclude that the material facts concerning the parties' claims and defenses were not in dispute.
Based on the undisputed evidence, a reasonable factfinder could not conclude otherwise than that the contract's fifty-five gallon estimate for non-hazardous groundwater was an error. The specifications called for pumping and disposal of water from seventeen wells. The jetting method called for pumping forty gallons per minute. An after-the-fact estimate from CDM of the production of the pumping and surging method was that 600 to 1000 gallons could have been expected per well.
*628 The record also supports a strong suspicion that Dugan must have known of the mistake when it put its bid together and that Dugan deliberately unbalanced its bid. See Green Island Constr. Co., Inc. v. County of Chenango, 212 A.D.2d 853, 622 N.Y.S.2d 132, 133 (N.Y.App.Div.3d Dept.), lv. denied, 86 N.Y.2d 705, 632 N.Y.S.2d 498, 656 N.E.2d 597 (1995). Unless its principals were utterly ignorant of the methodologies to be used in groundwater remediation, they must have known that either method would produce considerably more than fifty-five gallons over the life of the project. The fact that Dugan bid $50 per gallon to dispose of non-hazardous wastewater, but only bid $4 per gallon to dispose of hazardous wastewater, also suggests either a deliberate attempt to unbalance the bid, or that there was a mutual mistake on the part of both parties concerning the non-hazardous wastewater work.
However, we need not decide whether Dugan engaged in deliberate wrongdoing when it prepared its bid. First, Dugan was obligated under the contract to bring errors to NJTA's attention when it noticed them. There is no dispute that Dugan knew of the error two weeks before the work started, but did not notify NJTA of the error. Merely sending in daily logs for an inspector's signature, instead of directly telling the NJTA that it was about to incur $9.5 million in cost overruns, was not "notice." The lack of notice deprived the Chief Engineer of the opportunity to issue a change order for the increased quantities and thereby to invoke the provision of the contract providing for a negotiated price for cost overruns in excess of 25%.[5]
We also conclude that Dugan's conduct in giving no notice and then demanding $9.5 million in excess costs, was unconscionable and violated the duty of good faith and fair dealing that is inherent in every contract. See Sons of Thunder v. Borden, Inc., 148 N.J. 396, 420, 690 A.2d 575 (1997). Finally, whether the mistake in the contract was unilateral or mutual, the consequences to the NJTA of enforcing the contract are so economically dire, grossly disproportionate to the value of the work, and otherwise unconscionable as to justify reformation of the contract
We begin with one of the' most fundamental principles undergirding the public bidding laws:
The purpose is to secure competition and to guard against favoritism, improvidence, extravagance and corruption. Statutes directed toward these ends are for the benefit of the taxpayers and not the bidders; they should be construed with sole reference to the public good; and they should be rigidly adhered to by the courts.
[Hillside v. Sternin, 25 N.J. 317, 322, 136 A.2d 265 (1957) (emphasis added).]
In James Petrozello Co., Inc. v. Chatham Twp., 75 N.J.Super. 173, 182 A.2d 572 (App.Div.1962), we reviewed the importance of clarity in bid specifications that rely on unit pricing, to avoid manipulation in the awarding of the bid:
Invitations for bids in the form of unit prices, under proper circumstances, are not objectionable. Browning v. Freeholders of Bergen County, 79 N.J.L. 494, 76 A. 1054 (E. & A.1910); Armaniaco v. Cresskill, 62 N.J.Super. 476, 163 A.2d 379 (App.Div.1960). However, where *629 the unit price method is employed, fair estimates of the quantities to be ordered should, wherever possible, be specified in advance of the bidding to avoid any possible juggling of the figures in aid of a favorite bidder. Browning v. Freeholders of Bergen, supra. The giving of the estimates is for the express purpose of forming a basis for the "uniform comparison of bids."
[Id. at 179, 182 A.2d 572.]
A similar principle supported our recognition, in D'Annunzio, supra, of the doctrine of patent ambiguity. As we explained there, in construing a public contract a contractor has an obligation to alert the public entity to possible errors in a contract before bidding on it:
This is not a private contract, but one involving a governmental instrumentality. Such contracts must be let only after the broadest opportunity for public bidding is given in order to secure competition, and guard against favoritism, improvidence, extravagance and corruption. An essential element of the bidding process is a common standard of competition. To that end, the conditions and specifications must apply equally to all prospective bidders, thus permitting the contractors to prepare their bids on the same basis. It is to assure a level playing field that contractors are urged in bid documents to examine the documents thoroughly, make site visits, attend prebid conferences, and raise questions about the drawings, specifications and conditions of bidding and performing the work. To every possible extent, such questions should be addressed before bid opening.
[D'Annunzio, supra, 245 N.J.Super. at 532-33, 586 A.2d 301.]
For this reason, in D'Annunzio we recognized the doctrine of patent ambiguity:
A necessary part of this salutary approach to public contracting is the doctrine of patent ambiguity, which has become a well-known principle of federal government contract law. See Collins Int'l Serv. Co. v. United States, 744 F.2d 812, 814 (Fed.Cir.1984). The doctrine is equally valid in the context of publicly bid contracts in New Jersey, and therefore should be applied to such contracts.
The doctrine of patent ambiguity is an exception to the general rule that a contract, and any latent ambiguities in it, should be construed against the party that wrote it. Newsom v. United States, 676 F.2d 647, 649, 230 Ct. Cl. 301 (1982); cf. United States v. Turner Constr. Co., 819 F.2d 283 (Fed.Cir.1987).
[Id. at 533, 586 A.2d 301.]
Quoting from Newsom v. United States, supra, we further explained that:
If a patent ambiguity is found in a contract, the contractor has a duty to inquire of the contracting officer the true meaning of the contract before submitting a bid. This prevents contractors from taking advantage of the Government; it protects other bidders by ensuring that all bidders bid on the same specifications; and it materially aids the administration of Government contracts by requiring that ambiguities be raised before the contract is bid on, thus avoiding costly litigation after the fact.

Newsom, 676 F.2d at 649. The existence of a patent ambiguity creates the duty to inquire of the public body or of whomever it may designate to receive inquiries. A contractor who fails to inquire into a patent ambiguity may not successfully make a claim for contract payments based on the contractor's interpretation of the ambiguous language of the contract, no matter how reasonable its interpretation may be.

*630 An ambiguity is a patent one if it is one which either (1) would have been apparent to reasonable prospective bidders from the facts available, or (2) was in fact known to the contractor before submitting its bid.
[Id. at 533-34 (citations omitted).]
In D'Annunzio, we rejected a contractor's claim for an additional $1.1 million for excavation and fill work for which the contractor claimed it was entitled to bill at the rate of $100 per yard. We concluded that the contractor could not take advantage of an ambiguity in the contract to claim compensation on a unit price basis. Id. at 534, 586 A.2d 301.
We recognize, as did the trial judge, that the doctrine of patent ambiguity may be applicable here, in the sense that there is clearly a problem in the contract. However, the difficulty in the contract is more precisely described as a mistake rather than an ambiguity. There is simply no way that this contract could have involved only fifty-five gallons of wastewater to be, disposed of. However, our law recognizes equitable doctrines that afford relief in these circumstances.
In this case, the contract cannot be rescinded, because it has already been performed. However, we consider the factors to be weighed in a claim for rescission because they may be relevant here:
The essential conditions to such relief by way of rescission for mistake are (1) the mistake must be of so great a consequence that to enforce the contract as actually made would be unconscionable; (2) the matter as to which the mistake was made must relate to the material feature of the contract; (3) the mistake must have occurred notwithstanding the exercise of reasonable care by the party making the mistake, and (4) it must be able to get relief by way of rescission without serious prejudice to the other party, except for loss of his bargain. [Catcddo Constr. Co. v. County of Essex, 110 N.J.Super. 414, 418-19, 265 A.2d 842 (Ch.Div.1970) (quoting Conduit & Foundation Corp. v. Atlantic City, 2 N.J.Super. 433, 440, 64 A.2d 382 (Ch.Div. 1949)).]
Where a contract cannot be rescinded, reformation may still be available as an equitable remedy. Hence, we turn to the issue of reformation. "The traditional grounds justifying reformation of an instrument are either mutual mistake or unilateral mistake by one party and fraud or unconscionable conduct by the other." St. Pius X House of Retreats, Salvatorian Fathers v. Diocese of Camden, 88 N.J. 571, 577, 443 A.2d 1052 (1982). Reformation may be applied to provide relief to either a contractor or a public body where required by principles of equity:
Reformation of a contract will be granted to rectify a mutual mistake. Dover Farms, Inc. v. American Air Lines, Inc., 111 N.J.Super. 276, 268 A.2d 289 (App.Div.1970), certif. denied, 57 N.J. 140, 270 A.2d 43 (1970); Brodzinsky v. Pulek, 75 N.J.Super. 40, 47-48, 182 A.2d 149 (App.Div.1962), certif. denied, 38 N.J. 304, 184 A.2d 419 (1962); cf. Heake v. Atlantic Cas. Ins. Co., 15 N.J. 475, 481, 105 A.2d 526 (1954). The problem normally arises when the agreement fails to specify correctly the terms that the parties agreed upon, such as where a deed absolute on its face was actually intended as a mortgage. See Brodzinsky v. Pulek, supra. But the principle of granting relief from a mutual mistake should be applied in this case as well to implement the legislative policy which [envelops] these contracts.
Under public bidding laws a contractor may, in appropriate circumstances be relieved of his undertaking even for a *631 unilateral mistake, if it is of a serious nature. Cataldo Constr. Co. v. Essex Cty., 110 N.J.Super. 414, 265 A.2d 842 (Ch.Div.1970); Conduit & Foundation Corp. v. Atlantic City, 2 N.J.Super. 433, 64 A.2d 382 (Ch.Div.1949); see Annotation, "Rights and remedies of bidder for public contract who has not entered into a contract, where bid was based on his own mistake of fact or that of his employees," 52 A.L.R.2d 792 (1957); cf. Edelstein v. Asbury Park, 51 N.J.Super. 368, 389-392, 143 A.2d 860 (App.Div. 1958). It is not in the public interest to hold a bidder to a contract which would compel performance at a substantial loss due to a serious error in his bid proposal. Here, as well, where the injury would fall on the public and may be remedied without loss to the contractor, equitable relief in the form of reformation may be invoked in favor of the public authority.
[Edward D. Lord, Inc. v. Municipal Utilities Authority, 133 N.J.Super. 503, 507-08, 337, A.2d 621 (App.Div.1975).]
In Intertech Associates, Inc. v. City of Paterson, 255 N.J.Super. 52, 604 A.2d 628 (App.Div.1992), we found rescission to be a proper remedy where a public body made a unilateral mistake. Relying on Lord, we reasoned:
While unilateral mistake of a fact unknown to the other party is not ordinarily grounds for avoidance of a contract, rescission in the context of public bids on the basis of unilateral mistake made in good faith has been afforded under certain circumstances. Cataldo Constr. Co. v. County of Essex, 110 N.J.Super. 414, 265 A.2d 842 (Ch.Div.1970); Conduit & Foundation Corp. v. Atlantic City, 2 N.J.Super. 433, 64 A.2d 382 (Ch. Div.1949). See also Terminal Constr. Corp. v. Atlantic Cty. Sewerage Auth., 67 N.J. 403, 407-08, 341 A.2d 327 (1975). "To qualify for the equitable relief sought, [the party] must show, special circumstances justifying a departure from the generally controlling principle that parties are bound by the contracts they make for themselves." Cataldo Constr. Co. v. County of Essex, 110 N.J.Super at 418, 265 A.2d 842. These special circumstances have been described as: (1) the mistake must be of so great a consequence that to enforce the contract as actually made would be unconscionable; (2) the matter as to which the mistake was made must relate to the material feature of the contract; (3) the mistake must have occurred notwithstanding the exercise of reasonable care by the party making the mistake, and (4) the requested rescission cannot cause serious prejudice to the other party, except for loss of bargain. Conduit & Foundation Corp. v. Atlantic City, 2 N.J.Super. at 440, 64 A.2d 382.
[Id. at 59-60, 604 A.2d 628.]
Citing Cataldo, supra, where we gave equitable relief to a contractor, we acknowledged the fairness of applying the doctrine to public bodies as well as contractors:
The court also noted that a substantial number of jurisdictions have been "strongly in favor of relief for the erring contractor" where the mistake was promptly discovered and brought to the attention of the public body before the execution of a formal contract, and where there is no substantial disadvantage to the solicitor of the bids other than loss of bargain. Id. at 423, 265 A.2d 842. We see no basis for a different conclusion when the erring party is the governmental body.
[Intel-tech, supra, 255 N.J.Super. at 61, 604 A.2d 628.]
In a somewhat similar case to the one before us, Green Island Const. Company, *632 Inc. v. County of Chenango, 212 A.D.2d 853, 622 N.Y.S.2d 132 (3d Dept.), lv. denied, 86 N.Y.2d 705, 632 N.Y.S.2d 498, 656 N.E.2d 597 (1995), a construction contractor submitted an "unbalanced" bid, which set forth high prices for work the volume of which it knew had been underestimated in the contract. The contractor also bid a low price on other parts of the job to offset its high bid on the under-estimated work. Without calling the error to the County's attention, the contractor proceeded to remove much higher volumes of earth than the contract estimated would be required, and then sought to recover from the. County the resulting enormous cost overrun.
Prior to submitting its bid for the project, plaintiff conducted independent testing of the soil at the site and determined that CPM's estimates as to the quantity of different types of earth to be excavated were inaccurate. Plaintiff did not, however, inform defendant of these discrepancies. Plaintiff thereafter submitted an "unbalanced bid" for the project, which included deflated unit prices for excavation of those types of earth that plaintiff felt would require less work than specified in the bid and higher unit prices on those items that plaintiff expected to require more work than specified in the bid. As plaintiff's total bid of $ 7,064,338 was the lowest bid submitted, plaintiff was awarded the contract for the project.
Plaintiff and defendant thereafter entered into a unit price contract which provided, inter alia, that plaintiff would be paid the price specified in its bid for each unit of work actually performed and approved for payment by CPM. The contract itself provided, in relevant part, that "[plaintiff] has heretofore given [CPM] written notice of all conflicts, errors or discrepancies that [it] has discovered in the Contract Documents and the written resolution thereof by [CPM] is acceptable to [plaintiff]" and contained several "notice provisions" requiring plaintiff to, inter alia, "promptly report in writing to [CPM] any conflict, error or discrepancy which [it] may discover and * * * obtain a written interpretation or clarification from [CPM] before proceeding with any work affected thereby".
[Id. at 133.]
Relying on language in the contract requiring the contractor to bring errors to the agency's attention before undertaking work that might be affected by the error, the court rejected the contractor's claim for additional payment:
[T]he contract between plaintiff and defendant contained several notice provisions, including the following:
Before undertaking each part of the Work, [plaintiff] shall carefully study and compare the Contract Documents and verify pertinent figures shown thereon and all applicable field measurements. [Plaintiff] shall promptly report in writing to [CPM] any conflict, error or discrepancy which [plaintiff] may discover and shall obtain a written interpretation or clarification from [CPM] before proceeding with any Work affected thereby; however, [plaintiff] shall not be liable to [defendant] or [CPM] for failure to report any conflict, error or discrepancy in the Contract Documents, unless [plaintiff] had actual knowledge thereof or should reasonably have known thereof (emphasis supplied).
As defendant correctly observes, such language reasonably implies that the parties intended plaintiff to be held liable for failing to report such errors where, as here, it had actual knowledge of the discrepancies existing in the specifications with regard to the quantity of *633 the various types of earth to be excavated. . . .
In view of the contractual notice provisions, it cannot seriously be argued that plaintiff did not have a duty to report the inaccuracies it discovered in the bid specifications relative to the various quantities of earth to be excavated at the site. In this regard, to the extent that plaintiff contends that the parties, by agreeing to a unit price contract, assumed the risk that the actual work performed would exceed the estimates set forth in the specifications and, hence, no notice of overruns was required, we find that argument to be lacking in merit in view of the specific contractual notice provisions.
[Id. at 133-34 (citations omitted).]
We find Green Island to be on point here. By contrast, Dugan's reliance on Ell-Dorer Contracting Co. v. State, 197 N.J.Super, 175, 484 A.2d 356 (App.Div. 1984), is misplaced. Dugan relies on the following language from Ell-Dorer:
Finally we point out that it is entirely possible that the bidding documents might substantially underestimate the quantity of an item. Surely in that case a contractor would not be limited to the original extended price. Thus, we see no reason why the State should be so bound when the quantity is less than that originally anticipated.
[Id. at 184, 484 A.2d 356.]
However, the quoted language is dictum. Ell-Dorer concerned a contract in which the agency's bid specification approximated a need to excavate some 19,000 cubic yards of dirt. When the actual yardage was about 6000 less than the estimate, the contractor demanded payment, at the percubic yard unit price it had bid, for work it had not performedthat is, for the extra 6000 cubic yards. Our holding was based on specific language in the contract limiting the State's liability to work actually performed. Based on that language, we concluded "These articles are straightforward and unambiguous. They limit the State's liability to payment for the actual quantity of work done. Indeed we do not see how they could be more specific." Id. at 183, 484 A.2d 356. We then noted that the contract contained many unit prices for various portions of the work, and that the purpose of unit pricing was to require the State to pay only for work actually performed.
In that context, we indicated that, in a factual situation not presented in Ell-Dorer, the contractor would be entitled to payment for work performed even if the contract underestimated the quantities required. However, Ell-Dorer did not address a situation, as here, in which the projected unit quantity was so wildly at variance with the realities of the job to be done as to be an obvious mistake. Nor did Ell-Dorer involve a contract where the contractor's quoted unit price for the work was so patently excessive.[6]
Based on the foregoing cases, we conclude that the proper doctrine applicable to this case is not patent ambiguity but reformation. By reforming the contract, we can give NJTA, the benefit of a fair price for the work and give Dugan compensation for the work it performed, despite its attempted overreaching.[7] The *634 undisputed evidence in the record quantifies the value of the extra work done at $52,330. Therefore, while we affirm the trial judge's rejection of Dugan's $9.5 million claim, we remand this matter to the trial court to enter judgment for Dugan in the amount of $52,330. Given Dugan's inequitable conduct, prejudgment interest is not warranted.
Affirmed in part, modified in part and remanded.
NOTES
[1] We have not considered materials which we did not request but which were improperly sent to us after oral argument. We have, however, considered the parties' statements of material facts, R. 4:46-2, which were submitted to us at our request.
[2] CDM and URS were originally defendants in the trial court, but they are not parties to this appeal because plaintiff's claims against them were resolved. Likewise, plaintiff settled its claim against the NJTA with respect to soil excavation, leaving only the claim for disposal of wastewater which is the subject of this appeal.
[3] In an affidavit dated September 28, 2005, Lee Oakland, NJTA's lead official in connection with the performance of the contract, attested that "[f]or the water work, no notice from plaintiff of an overrun was ever given prior to the completion of that work."
[4] According to the resident engineer on the project, Ralph Fasano, the URS inspectors "involved in inspecting the drilling operations were unaware of what the contract quantities were." There is no dispute that Celan, the regularly assigned URS inspector on this job, was on vacation while the pumping was taking place; a replacement, Michael Huston, filled in for Celan and signed the well logs.
[5] The lack of notice also deprived NJTA of the opportunity to exercise the "termination for convenience clause" of the contract. Plaintiffs arguments regarding the termination clause are without sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).
[6] We recognize the possibility that for some work, there may be sufficiently large fixed costs associated with performance that disposing of only small quantities would require a high unit price. However, even if there were fixed costs associated with pumping and disposing of wastewater, such as renting holding tanks, trucks and pumps, when the job involved huge quantities of water the cost per gallon would necessarily drop.
[7] We exercise our original jurisdiction for this purpose, mindful of the cost of further litigation, the absence of factual disputes, and the relatively small sum to be awarded. Further, we find reformation to be an appropriate remedy even in the absence of an explanation as to how the error in the contract occurred.