708 A.2d 779

J.L.B. EQUITIES, INC., PLAINTIFF–APPELLANT–CROSS–RESPONDENT, v. W. HUNT DUMONT, ESQ., IN HIS CAPACITY AS STATUTORY RECEIVER OF TRIAD INVESTMENT PARTNERSHIP–1986, L.P., DEFENDANT–RESPONDENT–CROSS–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued March 30, 1998—Decided May 1, 1998.

Before Judges PETRELLA, EICHEN and STEINBERG.

*Jerrold I. Langer,* argued the cause for appellant-cross-respondent (*Greiner & Langer,* attorneys; *Mr. Langer,* of counsel and on the brief; *Christopher P. Anton,* also on the brief).

*David M. Repetto,* argued the cause for respondent-cross-appellant (*Harwood Lloyd,* attorneys; *Frank V. Lloyd,* of counsel and on the brief; *Mr. Repetto,* also on the brief).

The opinion of the court was delivered by

PETRELLA, P.J.A.D.

This is an appeal by J.L.B. Equities, Inc. (J.L.B.) from an order of the Law Division dismissing its negligence case against defendant W. Hunt Dumont for alleged breach of his duties as receiver of Triad Investment Partnership–1986, L.P. (Triad). The judge granted Dumont's motion to dismiss the complaint and denied J.L.B.'s cross-motion for summary judgment.

J.L.B. has appealed, arguing that the judge erred in holding that (1) its complaint is barred by its failure to intervene in the receivership action or seek an order vacating Dumont's discharge as receiver; (2) *N.J.S.A.* 14A:14–18 barred its complaint; and (3) its complaint is barred by laches. Dumont cross-appeals from the denial of certain requests for relief on his motion for summary judgment[1] and the rejection of his entire controversy doctrine argument. Dumont asserts that the judge should also have dismissed J.L.B.'s complaint based on estoppel and waiver grounds.

These are the facts. On February 3, 1986, J.L.B. loaned City Center Associates, L.P. (City Center) $600,000 secured by a note of even date and a mortgage on real property owned by City Center at 900 Broad Street, Newark, consisting of a two-story office building of approximately 18,000 square feet. The first floor of the subject property was leased to City National Bank (CNB) and Jay's Shoe repair. Although the mortgage indicated that it was not subordinate to any other mortgages, a title report disclosed that Capital Real Estate Corporation (Capital) held a $250,000 first mortgage on the property.

Subsequently, City Center conveyed the property to Bilt–Rite Construction Corp., which in turn conveyed it to Triad, a limited

---

[1] Although the order recited that the motion judge rejected Dumont's argument that J.L.B.'s "complaint be dismissed on the basis of summary judgment," the judge relied on materials outside of the pleadings, and therefore, the matter was actually disposed of on a summary judgment basis. *See R.* 4:6–2; and *R.* 4:46–2.

partnership formed by John Armand Ounigian, a/k/a John Kimble.[2]

On February 15, 1989, a $56,763.96 tax sale certificate issued against the property. J.L.B. commenced foreclosure proceedings on August 17, 1989, at which time it was owed principal and interest of approximately $700,000.00 under the note.

The limited partners of Triad filed a complaint seeking a dissolution, an accounting and appointment of a receiver because Triad had become insolvent or was being operated at a loss, or both. The complaint alleged that Triad was formed for the production of income from three investment properties, including the property at 900 Broad Street. In late 1988, either the income distributions to the limited partners ceased or checks received were dishonored due to insufficient funds, or both, thus precipitating the suit. In August and September 1989, the Chancery Division appointed Dumont receiver of Triad.[3] J.L.B. was not a party in the action which resulted in Dumont being appointed the receiver for Triad.

As receiver, Dumont hired a commercial real estate broker to market and sell the subject property. On October 3, 1989, K & L Properties offered to purchase the property for $850,000. On October 25, 1989, J.O.L. Associates appraised the property at $925,000. On December 27, 1989, CNB offered to purchase the property for $955,000 in cash. K & L Properties increased its offer to purchase the property to $955,000 on January 4, 1990, and to $960,000 by a February 23, 1990 transmittal by Main Street USA Realty, with a copy sent to J.L.B. A contingent offer by Edmund Damiano in the amount of $1.2 million was transmitted by Main Street USA Realty for the property on September 18,

---

[2] According to Dumont, Kimble formed the Triad partnership in order to "bilk investors out of their investments." Kimble was convicted on fraud charges. Dumont asserts that no assets were left in Triad to satisfy creditors.

[3] The order appointing Dumont receiver for Triad was signed on August 22, 1989. Ultimately, Dumont became receiver for seventeen related partnerships.

1989, and addressed to Walter Kenworthy of Combined Property Investors. However, Dumont asserts that he was not made aware of that offer until after it was withdrawn when an attorney in his office received a February 9, 1990 letter from Main Street USA Realty indicating Damiano had withdrawn it. The record does not indicate that Dumont was aware of the September 18, 1989 letter prior to receiving the February 9, 1990 letter.

Although Craig J. Hyman, Vice–President of J.L.B. certified that J.L.B. did not possess knowledge of the offers for the property, the record indicates that J.L.B. was aware in January 1990 of the offers to purchase the property and that Dumont had not effected a sale. On January 11, 1990, J.L.B.'s former attorney [4] wrote to Dumont that his client was "developing a considerable concern for the reason for delay" in accepting the $955,000 offer from CNB. On January 19, 1990, Dumont's attorney forwarded J.L.B.'s attorney a letter written to the Chancery Judge which explained the financial status of the property and indicated that "we do not feel that we are in a position to accept either of the outstanding bids...."

As of January 11, 1990, J.L.B. was owed approximately $712,800 in principal and interest on the note. J.L.B. contends that Dumont failed to perform his duties as receiver for Triad by refusing to sell the property and thus preventing it from satisfying its note. Dumont contends that the lack of equity in the property prevented him from conveying it to any of the prospective purchasers. He asserted that approximately $1.2 million was owed on the property, consisting of $713,000 on the note payable to J.L.B., $57,000 in 1987 taxes, $63,000 in 1988 taxes, $60,000 in 1989 taxes, approximately $60,000 in closing fees, and $250,000 on the note to Capital. In addition, Dumont indicated that the property had structural damage, was in need of plumbing repairs, a new boiler and interior and exterior construction work and that the only income

---

[4] J.L.B. obtained new counsel for this appeal.

he received from the property was $5,000 in monthly rent paid by CNB and Jay's Shoe repair.

Dumont contends that all the creditors, including J.L.B., were aware of the financial condition of the property, and there were no indications that any creditor was willing to accept less than full payment. Hence, Dumont concluded that he could not sell the property. J.L.B. contends that if it had been informed of the financial condition of the property, it would have reduced its claim in order to "cash out."

Due to the inability to sell the property because of the extent and number of outstanding liens, as well as needed repairs on the building, Dumont moved on February 20, 1990, to withdraw as receiver of Triad as well as certain other entities. J.L.B.'s attorney had notice of Dumont's motion to withdraw. It was not until August 29, 1990, that the Chancery judge entered a consent order discharging Dumont as the receiver of Triad, and constituting J.L.B. as the mortgagee in possession of the property. J.L.B. did not object to Dumont being discharged as receiver and proceeded to pursue its rights as a mortgagee in possession.

In February 1991, CNB, a holdover tenant of the property, purchased a tax sale certificate sold by the City of Newark for $56,763.96, and instituted a foreclosure action thereon in March 1991. On June 5, 1991, J.L.B. instituted an action to evict CNB as a tenant of the property.

On November 5, 1991 J.L.B. took the deposition of Dumont and his associate. J.L.B. contends that as a result of these depositions it first realized that Dumont was negligent in his conduct as receiver. In December 1991, J.L.B. and other creditors filed a bankruptcy petition under Chapter 7 against City Center, the obligor on the note. J.L.B. and the two other creditors entered into a settlement agreement with CNB on June 8, 1992, under which CNB received title to the property and paid J.L.B. $270,000 for J.L.B.'s mortgage interest. J.L.B. instituted its negligence action in the Law Division against Dumont on November 11, 1994. Dumont's defense asserted, among other things, that J.L.B.'s sole

remedies lay in the receivership action, but that its failure to intervene there bars its claim.

Although no New Jersey case specifically deals with the duty of a potentially aggrieved party to intervene in a receivership proceeding, a similar situation arose in *Four Strong Winds, Inc. v. Lyngholm,* 826 P.2d 414, 416 (Colo.App.1992). There, a stockholder was appointed receiver for the foreclosure of a deed of trust that secured a note. The holder of the property argued that the receiver violated fiduciary obligations owed to him, specifically that the receiver damaged items on the property. These objections were raised at the discharge proceeding, but the judge discharged the receiver and disposed of the objections. There was no appeal taken. A subsequent action by the objector was dismissed on the ground that the order discharging a fiduciary was a final judgment and that any claim based upon claimed error by the receiver must be presented in the proceedings to discharge the receiver. *Id.* at 417. *See also Vitug v. Griffin,* 214 *Cal.App.*3d 488, 262 *Cal.Rptr.* 588, 592 (1989) (generally discharge of receiver is *res judicata* as to claims against receiver where there is notice of the discharge proceedings and the subject matter of the claim is before the court); *Suleiman v. Lasher,* 48 *Wash.App.* 373, 739 P.2d 712, 716 (1987) (no fiduciary duty existed after receivership dissolved); *Miller v. Everest,* 212 *N.W.*2d 522, 524 (Iowa 1973) (claims not barred as to claimants who received no notice of discharge proceeding).

 Here, J.L.B. had notice of the receivership termination proceeding and of claims against the receiver for duties arising during the receivership. Under these circumstances it had a duty to intervene in the proceeding or move to vacate the discharge in order to preserve its rights.

As noted, J.L.B.'s attorney wrote to the receiver on January 11, 1990, to indicate that his client was "developing considerable concern for the reason for delay" in accepting the $955,000 offer from CNB. On January 19, 1990, Dumont's attorney forwarded J.L.B.'s attorney a letter written to the Chancery Judge which explained the financial status of the property and indicated that

"we do not feel that we are in a position to accept either of the outstanding bids...." Presumably, J.L.B.'s attorney also received Dumont's February 20, 1990 certification submitted to the Chancery judge requesting he be allowed to withdraw as receiver and indicating he had no funds with which to operate. Thus, by the time of the discharge proceeding, and certainly the discharge in 1990, J.L.B. knew that Dumont had failed to sell the property despite receiving offers, and knew that it was allegedly injured as a result of Dumont's non-action. These facts indicate that the judge correctly concluded that J.L.B. was aware of its potential claims against Dumont for negligence in fulfilling his responsibilities as a receiver at the time of the receivership proceeding.[5]

Although J.L.B. frames its cause of action in this case as a negligence claim against the receiver "personally," its claim must be considered as against the receiver for alleged negligence committed by the receiver while acting in his official capacity. Dumont did not have authority as an individual to sell the property. He did not fail to sell the property or collect rent as an individual. Rather, what he did or did not do was in his official capacity as a receiver. *See McNulta v. Lochridge,* 141 *U.S.* 327, 332, 12 *S.Ct.* 11, 13, 35 *L.Ed.* 796, 800 (1891); *Hanlon v. Smith,* 175 *F.* 192, 197 (Cir.Ct.N.D.Iowa 1909) ("liability of receivers for acts done by them in the management of property placed in their custody by order of a court is official, and not personal"); *Miller v. Everest, supra,* 212 *N.W.*2d at 526;[6] and 66 *Am.Jur.*2d, *Receiv-*

---

[5] J.L.B. argues it did not become aware of Damiano's September 18, 1989 $1.2 million offer to Combined Property Investors, subject to specified conditions, until depositions were taken in November 1991. Even considering the evidence in the light most favorable to J.L.B., *see Brill v. Guardian Life Ins. Co. of America,* 142 *N.J.* 520, 540, 666 A.2d 146 (1995), it knew of the two outstanding offers to purchase the property, knew of the liens against the property and knew that Dumont did not plan to execute a sale, although the receiver had a bid for $955,000, which might have covered a substantial amount of the outstanding liens on the property and related costs.

[6] We reject *Miller* to the extent it can be read to indicate that management of assets can give rise to a personal claim against the receiver. A primary

*ers* §§ 367, 368 (1973). Here, in managing the assets of the estate Dumont acted in his official capacity and could only be found liable in that capacity, not personally.

We conclude that J.L.B. is now barred by failing to assert its claim at the time that the request for termination of the receivership was submitted. Even if J.L.B. was not fully aware of the extent of mismanagement it now claims, it certainly was aware prior to the termination of the receivership of sufficient facts to object to the actions of the receiver. *See e.g., Russo Farms, Inc. v. Vineland Bd. of Educ.,* 144 *N.J.* 84, 114–115, 675 *A.2d* 1077 (1996) (injured party need not know the extent of injury for the cause of action to accrue). Since J.L.B. had notice of the receivership termination proceeding and of the existence of the claims it may have had against the receiver for the receiver's official actions, the Law Division judge correctly dismissed J.L.B.'s complaint and barred its claim against Dumont brought long after the discharge proceeding. If the claims had been brought to the attention of the Chancery judge prior to the receiver's discharge, or shortly thereafter, appropriate action might have been taken by the court, if indeed any was necessary.

We hold that such claims against a receiver must be brought in the Chancery Division. In addition, a claimant such as J.L.B., who is aware at the time of the proceedings to discharge the receiver or to terminate the receivership, of potential claims against a court-appointed receiver arising from the receiver's official duties, and is aware of such proceeding, must move to intervene in the Chancery action, or alternatively must move to vacate the order of discharge within a reasonable time period in order to preserve its claims. Failure to do so bars J.L.B.'s claim. A new cause of action in the Law Division is inappropriate in any event.

---

responsibility of a court-appointed receiver is to manage the assets of the property, which includes selling the property. Management of assets arises from the receiver's official duties. *McNulta v. Lochridge, supra.*

In light of our decision, we need not address other issues raised by J.L.B., or on the cross-appeal.

Affirmed.