**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1323-20

DAVID M. COHEN, P.A., L.L.C.,

     Plaintiff-Respondent,

v.

DAVIS, SAPERSTEIN &
SALOMON, P.C.,

     Defendant-Appellant.

_____

Submitted February 28, 2022 – Decided March 24, 2022

Before Judges Sabatino and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-1807-19.

Davis, Saperstein & Salomon, PC, attorneys for appellant (David A. Drescher, on the briefs).

Noel E. Schablik, attorney for respondent.

PER CURIAM

In this dispute over the apportionment of attorney fees among two law firms, defendant, Davis, Saperstein & Salomon, P.C., appeals from a July 29,

2020 Law Division order granting summary judgment to plaintiff, David M. Cohen, P.A., LLC. The operative fee sharing agreement at issue required defendant to pay plaintiff twenty percent of those attorneys' fees realized from defendant's representation of Jorge Angamarca (Angamarca) in an underlying personal injury suit against, among other defendants, Jefferson Townhouses, LLC (Jefferson), the owner of the property where Angamarca was injured.

While that case was being litigated, defendant entered a separate agreement with Jefferson's counsel, Bruce Yukelson, Esq., under which Yukelson assigned Jefferson's potential bad faith action against its insurance carrier to Angamarca in exchange for a portion of any fees collected with respect to that claim. Defendant later settled all claims on Angamarca's behalf but disputed its obligation to pay Yukelson a fee.

Yukelson then sued defendant in New York for a portion of the related attorneys' fees. Yukelson was successful in his action against defendant. Defendant ultimately paid plaintiff a portion of the realized fees under their agreement, however, it calculated plaintiff's share based on a reduced total of attorneys' fees after deducting Yukelson's share and related expenses.

Plaintiff filed the present suit contending that by calculating his share after deducting amounts expended related to the Yukelson matter, defendant

2

wrongfully withheld funds due to him. After the close of discovery, the parties cross-moved for summary judgment. In granting summary judgment to plaintiff, the court found the fee sharing agreement unambiguous and rejected defendant's arguments that plaintiff's suit should be barred by various equitable doctrines. Defendant appeals contending that the court erred in finding the agreement unambiguous and declining to apply the doctrines of res judicata, waiver, laches, and the entire controversy doctrine. We disagree and affirm.

I.

We derive the following facts from the competent evidence in the summary judgment motion record, viewed in a light most favorable to defendant. Brill v. Guardian Life Ins. of Am., 142 N.J. 520, 540 (1995).

On October 30, 2003, Angamarca suffered severe personal injuries when he fell while working on a construction site. Plaintiff, a sole practitioner in New Jersey, was retained to represent Angamarca. As plaintiff began to prepare a workers' compensation action on Angamarca's behalf, he concluded that Angamarca also had "a viable [third-party] liability personal injury action, based upon the negligence of the parties responsible for maintaining a safe workplace." Because plaintiff was not licensed to practice in New York, where the incident occurred, he referred the matter to Kenneth Sacks, Esq., of Sacks & Sacks, LLP,

3

a New York-based law firm. Plaintiff and Sacks further agreed that they "would jointly represent Angamarca, and if the matter was resolved without a trial [Sacks] would receive [sixty percent] of the attorneys' fees and [plaintiff] would receive [forty percent]." Sacks thereafter filed suit on Angamarca's behalf in New York.

Less than a year later, Angamarca retained defendant and executed an attorney termination letter, which defendant sent to Sacks. Sacks initially refused to cease representing Angamarca, resulting in defendant filing an order to show cause to resolve the dispute. Before a hearing was held on defendant's application, defendant and Sacks entered an agreement, which defendant memorialized in a September 12, 2005 letter. The letter provided that defendant "agreed that [Sacks] will receive . . . twenty percent (20%) of our attorney's fees from the proceeds of any settlement or judgment in this case." (Emphasis added). It also required Sacks to execute a substitution of counsel and transfer the case file to defendant. Neither plaintiff nor Sacks performed any services on Angamarca's personal injury case after the fall of 2005.

On November 6, 2008, a New York trial court granted Angamarca summary judgment against all direct defendants in his New York personal injury action. The case proceeded to trial solely on the issue of damages, resulting in

4

a judgment against Jefferson. Jefferson filed a notice of appeal and defendant filed a cross-appeal for additur on Angamarca's behalf.

Thereafter, defendant discussed with Yukelson the possibility of pursuing a bad faith action against Jefferson's insurance carrier. Defendant and Yukelson agreed that they could not pursue the bad faith action at that time due to the pending appeal, but agreed in principle that Jefferson would assign its claim to Angamarca, and that defendant would retain Yukelson to assist in pursuing that claim.

On November 23, 2009, defendant sent Yukelson a letter memorializing their separate agreement. It specified that defendant "agree[d] to pay for the legal services [Yukelson] perform[ed] at the rate of $500 per billable hour or a total fee of ten per cent of any recovery of legal fees . . . whatever is greater." It stated further that Yukelson's fee was "based on the recovery by . . . Angamarca [as subrogee of] Jefferson . . . of money damages from [the insurance company] and/or its representatives . . . in excess of the underlying policy limits of [s]ix [m]illion [d]ollars." The letter also included that "[t]he legal fee to [Yukelson] shall be paid at the conclusion of any settlement or judgment regardless of whether a lawsuit has been file[d]." In the interim, on November

A-1323-20

11, 2009, Sacks wrote to defendant directing that plaintiff "will be receiving the entire fee from [defendant] based upon [Sacks's] attorney's lien."[1]

On June 21, 2011, the New York Appellate Division granted Angamarca's cross-appeal for additur, vacated a portion of the judgment, and remanded for a new trial on the issue of damages. In November 2011, defendant settled the matter on Angamarca's behalf by way of a confidential settlement agreement.[2]

During the settlement conference, representatives of Jefferson's insurance company allegedly indicated that they would not be making any payment toward a putative bad faith claim, and that their decision to settle was based on the significant amount of interest that would be accruing on any judgment. On January 17, 2012, defendant provided Angamarca with a "personal injury settlement statement" detailing the allocation of the settlement funds. The statement indicated that "attorney's fees" were calculated as one-third of the settlement amount, after ordinary disbursements.

---

[1] In the present action, plaintiff claims he was entitled to a twenty-percent share of the attorneys' fees from the underlying matter as assignee of the September 12, 2005 agreement between defendant and Sacks. He makes no claims pursuant to his original agreement with Sacks.

[2] To preserve the confidentiality of the settlement agreement, we omit references to specific dollar amounts throughout this opinion.

On January 25, 2012, Yukelson's counsel wrote to defendant demanding payment pursuant to their fee sharing agreement. Defendant took the position that Yukelson was not entitled to any share of the attorneys' fees because no portion of the settlement was allocated to the bad faith claim but instead was based on the insurer's decision to avoid the accrual of interest on any judgment. Nevertheless, in anticipation of litigation, defendant withheld disbursing "approximately [ten percent] of the attorney[s'] fee."

On February 1, 2012, a partner at defendant's firm, Marc C. Saperstein, Esq., met with plaintiff and tendered him a check. The parties agree that Saperstein alerted plaintiff that ten percent of his fee was being withheld. They disagree, however, regarding the content of Saperstein's explanation for that decision.

Saperstein claimed that he "explicitly explained" that Yukelson was challenging ten percent of defendant's gross fee and that "in the event Yukelson prevailed in the . . . [d]ispute, [plaintiff's] ultimate fee would be less than [plaintiff] initially thought it would have been - as it would be [twenty percent] of a reduced net number following payment to Yukelson and reduction of [defendant's] litigation costs in defending the action." He also asserts that plaintiff "fully understood the implications of the . . . [f]ee [d]ispute[,] . . . fully

7

assented" to defendant's withholding while the dispute was litigated, and "never disagreed with [Saperstein's] reasoning."

Plaintiff disputed the defendant's version of that conversation. Plaintiff claims Saperstein "briefly explained that the balance of the money had to be withheld because of some collateral claim by another lawyer" and that he "did not know what [Saperstein] was talking about." As a result, plaintiff emailed Saperstein later that day requesting "a letter indicating the amount of [his] fee that was held back and why." Saperstein responded stating "we held back [ten percent] of [plaintiff's] fee due to a fee dispute with personal counsel for Jefferson."

On July 12, 2012, plaintiff wrote to Yukelson's counsel, explained his interest in the matter, and maintained he never consented to, nor had knowledge of, the fee sharing agreement between defendant and Yukelson and requested that Yukelson consent to the release of the balance of his fee. The record contains no evidence of a response from Yukelson, or his counsel.

Yukelson filed suit in October 2012 against defendant in New York seeking to enforce his agreement with defendant and recover ten percent of defendant's fee on the portion of the settlement that was in excess of Jefferson's insurance policy limits (Yukelson Litigation). The court granted summary

judgment to Yukelson on June 2, 2015 and the New York Appellate Division affirmed on August 2, 2017. During the course of the Yukelson Litigation, Saperstein occasionally saw plaintiff at conventions and updated him as to the status of the case.

Plaintiff wrote to Saperstein on December 18, 2017, explaining that he "track[ed] the [Yukelson Litigation] through the New York court system" and realized the matter seemed to be resolved. As such, he requested that defendant pay the balance of his fee. Saperstein wrote back on January 10, 2018, explaining that his firm indeed lost at the trial and appellate levels and was required to pay Yukelson a portion of the fee. Saperstein enclosed a check and explained in the letter how the amount was calculated, including deductions for payments made to Yukelson's law firm and costs expended in the Yukelson Litigation.

Plaintiff did not deposit the check and instead filed the present action on March 7, 2019 contending that "[t]he fee dispute between [d]efendant and Yukelson is and was irrelevant to [d]efendant's contractual obligation to [p]laintiff" and "[d]efendant is wrongfully withholding or has wrongfully distributed from its trust account or misappropriated monies due [to] [p]laintiff."

As noted, following the close of discovery, plaintiff moved for summary judgment.

Defendant opposed plaintiff's application and cross-moved for summary judgment. In support, Saperstein provided a certification in which he explained that he drafted the letter memorializing the fee sharing agreement with Sacks and that "[t]he intent of the [f]ee [a]greement was that Sacks's portion of the fee would be calculated based on the net attorney's fees realized by [defendant] – [i.e.,] "our" – or [defendant's] fee. It was never the intention of [defendant] to share [twenty percent] of the gross attorneys' fees with Sacks."

Judge Thomas R. Vena heard oral arguments on the parties' motions on July 29, 2020 and issued two coincident orders, one granting plaintiff's motion for summary judgment and the other denying defendant's cross-motion for summary judgment. He also provided the reasons supporting his decision on the record and in a written opinion.

Judge Vena found that the fee sharing agreement between Sacks and defendant was "clear and unambiguous" and that "[p]laintiff was an assignee of Sack[s]'s contractual rights." As such, the judge found that, after Angamarca's case settled, "[p]laintiff should have been paid his fee in total." He also concluded that neither defendant's agreement with Yukelson nor the Yukelson

Litigation "affect[ed] the agreement that [p]laintiff should receive [twenty percent] of the . . . attorney's fee collected by [d]efendant after Mr. Angamarca's case was ultimately settled."

Finally, Judge Vena disagreed with defendant's argument that "the doctrines of waiver, laches[,] and res judicata, together with the entire case doctrine . . . appl[ied]" to bar plaintiff's claims. He explained, "with an enforceable contract in hand, there was no requirement for [p]laintiff to intervene in the [Yukelson] [L]itigation. He did not waive his rights under the contract, and this suit is not rehashing issues previously resolved. That litigation pertained to . . . Yukelson's separate agreement with [d]efendant."

This appeal followed in which defendant again argues plaintiff's action should have been barred by the doctrines of res judicata, waiver, laches, and the entire controversy doctrine. Second, defendant asserts that material factual issues existed in the motion record, and, as such, the judge erred by granting summary judgment.

## II.

Defendant first argues that Judge Vena should have granted its motion for summary judgment based on the doctrines of res judicata, waiver, and laches, and the entire controversy doctrine. It further explains that the present suit

A-1323-20

should be barred because plaintiff failed to intervene in the Yukelson Litigation despite being on notice that the allocation of the attorneys' fees was in dispute. We disagree with all of defendant's arguments.

A.    Res Judicata

Defendant contends plaintiff's suit should have been barred by res judicata because the court's grant of summary judgment in the Yukelson Litigation was a final judgment on the merits, plaintiff was in privity to defendant by way of the assignment of Sacks's fee sharing agreement, and the two matters were based on the same transaction or occurrence, "the division of the attorney[s'] fee in the [u]nderlying [m]atter."    "The application of res judicata is a question of law . . . ." Selective Ins. Co. v. McAllister, 327 N.J. Super. 168, 173, (App. Div. 2000).  Thus, we review its application de novo.  Walker v. Choudhary, 425 N.J. Super. 135, 151 (App. Div. 2012).

Under the doctrine of res judicata, a "cause of action between parties that has been finally determined on the merits by a tribunal having jurisdiction cannot be relitigated by those parties or their privies in a new proceeding." Velasquez v. Franz, 123 N.J. 498, 505 (1991).  For res judicata to apply, there must be "'substantially similar or identical causes of action and issues, parties, and relief sought,' as well as a final judgment."  Wadeer v. New Jersey Mfrs.

12

Ins. Co., 220 N.J. 591, 606 (2015) (quoting Culver v. Ins. Co. of N. Am., 115 N.J. 451, 460 (1989)). To decide whether two causes of action are the same, the court is to determine:

> (1) whether the acts complained of and the demand for relief are the same (that is, whether the wrong for which redress is sought is the same in both actions); (2) whether the theory of recovery is the same; (3) whether the witnesses and documents necessary at trial are the same (that is, whether the same evidence necessary to maintain the second action would have been sufficient to support the first); and (4) whether the material facts alleged are the same.
>
> [Id. at 606-07 (quoting Culver, 115 N.J. at 461-62).]

Here, the present action is decidedly different from the Yukelson Litigation, such that the doctrine of res judicata is inapplicable. First, because each case turned on the interpretation and application of separate agreements, the issues and causes of action were not "substantially similar or identical." Id. at 606 (quoting Culver, 115 N.J. at 460). For example, the cases involved separate contracts as the Yukelson Litigation centered on the November 23, 2009 agreement between Yukelson and defendant, whereas the present action is focused on the September 12, 2005 agreement between Sacks and defendant. See ibid. (quoting Culver, 115 N.J. at 462). Those disputes involved different "complained of [acts]" and "demand[s] for relief," because each case involved a

13

claim for a portion of the attorneys' fees under the terms of those separate agreements. Ibid. (quoting Culver, 115 N.J. at 461). Second, the parties in each action were not "substantially similar or identical." Id. at 606 (quoting Culver, 115 N.J. at 460).

## B.    Entire Controversy Doctrine

Defendant next claims the present action should be barred by the entire controversy doctrine because it "arose out of the exact same commonality of facts" as the Yukelson Litigation and plaintiff "was on notice of the pendency of that matter . . . yet took no action to intervene or have his rights represented." In short, defendant claims plaintiff "had a duty to intervene" in the Yukelson Litigation, relying on J.L.B. Equities, Inc. v. Dumont, 310 N.J. Super. 366 (App. Div. 1998).

Like res judicata, whether the entire controversy doctrine applies is a question of law. See Higgins v. Thurber, 413 N.J. Super. 1, 6 (App. Div. 2010), aff'd, 205 N.J. 227 (2011). The entire controversy doctrine is an equitable principle that requires the parties to a suit to assert "all transactionally related claims" they have against each other or be barred from bringing those claims in subsequent litigation. K-Land Corp. No. 28 v. Landis Sewerage Auth., 173 N.J. 59, 70 (2002) (quoting Pressler, Current N.J. Court Rules, cmts. 1 & 2 on R.

14

4:30A (2002)).  The doctrine is intended "to encourage comprehensive and conclusive litigation determinations, to avoid fragmentation of litigation, and to promote party fairness and judicial economy and efficiency."  Ibid. (quoting Pressler, Current N.J. Court Rules, cmts. 1 & 2 on R. 4:30A (2002)).  Under the entire controversy doctrine, claims must be joined so "that all aspects of the controversy between those who are parties to the litigation be included in a single action."  Ibid. (emphasis added) (quoting Pressler, Current N.J. Court Rules, cmts. 1 & 2 on R. 4:30A (2002)).

The entire controversy doctrine does not operate to bar plaintiff's action because plaintiff was not a party to the New York-based Yukelson Litigation. Thus, that doctrine, which requires "those who are parties to the litigation" to assert "all transactionally related claims" they have against each other, is clearly inapplicable to plaintiff.  Ibid.  (quoting Pressler, Current N.J. Court Rules, cmts. 1 & 2 on R. 4:30A (2002)).  On this point, defendant fails to address, or explain, why it did not join plaintiff in the Yukelson litigation.

Further, contrary to defendant's argument, plaintiff had no obligation to intervene in the Yukelson Litigation.  Indeed, the only authority defendant cites supporting his assertion that plaintiff had a "duty to intervene," J.L.B. Equities, Inc., 310 N.J. Super. 366, is clearly distinguishable.

There, the plaintiff sued a receiver personally for "alleged negligence committed by the receiver while acting in his official capacity" over four years after the receivership ended. Id. at 371-73. The court found that the receiver "could only be found liable in [his official] capacity" and that because the plaintiff "had notice of the receivership and of claims against the receiver . . . [u]nder the circumstances it had a duty to intervene in the [receivership discharge] proceeding or move to vacate the discharge in order to preserve its rights." Id. 372, 374.

The holding of J.L.B. Equities, Inc. was particularly narrow and constrained to the unique circumstances where the plaintiff sought to sue a receiver for acts in his official capacity long after he was discharged. As such, it offers minimal guidance here, especially in light of the absence of applicable authority, and the provisions of our Rules which do not contemplate intervention as a mandatory procedure. See R. 4:33-1 ("Upon timely application anyone shall be permitted to intervene . . . ." (emphasis added)); R. 4:33-2 (same); R. 4:33-3 (describing the procedure for "[a] person desiring to intervene" (emphasis added)); see also N.Y. C.P.L.R. § 1012 (describing circumstances when a person "shall be permitted to intervene" (emphasis added)); N.Y. C.P.L.R. § 1013 (similar). Again, if defendant believed plaintiff was an indispensable or

16

necessary party to the Yukelson Litigation, nothing prevented it from joining plaintiff in that action. It tellingly elected not to do so.

C.    Waiver

Defendant also argues plaintiff "waived his right to the disputed portion of the . . . fee by failing to intervene in the [Yukelson] Litigation." In support, defendant again asserts that plaintiff "was well aware of the nature of the [Yukelson] Litigation" and "had an absolute right to intervene" but "chose not to."

"Waiver is the voluntary and intentional relinquishment of a known right." Knorr v. Smeal, 178 N.J. 169, 177 (2003). "An effective waiver requires a party to have full knowledge of his legal rights and intent to surrender those rights." Ibid.    "The intent to waive need not be stated expressly, provided the circumstances clearly show that the party knew of the right and then abandoned it, either by design or indifference." Ibid.    "The party waiving a known right must do so clearly, unequivocally, and decisively." Ibid.

Here, the record does not support that plaintiff waived his rights under the fee sharing agreement. First, as noted, plaintiff did not have a duty to intervene in the Yukelson Litigation. Second, no act or omission by plaintiff suggested that he "clearly, unequivocally, and decisively" waived his rights under the fee

sharing agreement. Ibid. To the contrary, plaintiff's actions, as evidenced in the record, suggest that he continually sought to exercise his rights under the agreement by: 1) requesting from defendant a written explanation regarding why his fee was being withheld; 2) seeking Yukelson consent to the release of his fee; 3) speaking to Saperstein about the status of the Yukelson Litigation when they had occasion to see each other; 4) tracking the Yukelson Litigation's status; 5) demanding payment upon the resolution of the Yukelson Litigation; and 6) initiating the present action.

D.   Laches

Defendant argues that relief to plaintiff should be barred by the doctrine of laches. Specifically, defendant asserts that plaintiff had "every right to intervene" in the Yukelson Litigation and "make a claim for what he believed he was entitled to" but "failed to do so and is unable to provide any reason for the delay." Further, defendant claims it was prejudiced by the delay because defendant "was forced to relitigate the breakdown of the fee" in the present action and "expend[] significant resources" in the process.

"[W]hether laches should be applied depends upon the facts of the particular case and is a matter within the sound discretion of the trial court." Fox v. Millman, 210 N.J. 401, 418 (2012) (quoting Mancini v. Twp. of Teaneck,

179 N.J. 425, 436 (2004)). As such, the application of the doctrine of laches is reviewed for an abuse of discretion. United States v. Scurry, 193 N.J. 492, 504 (2008).

Laches is a concept that arises from "the neglect for an unreasonable and unexplained length of time . . . to do what in law should have been done." Lavin v. Bd. of Educ., 90 N.J. 145, 151 (1982) (quoting Atlantic City v. Civil Serv. Comm'n, 3 N.J. Super. 57, 60 (App. Div. 1949)). The doctrine bars relief when the delaying party had ample opportunity to bring a claim, and the party invoking the doctrine was acting in good faith in believing that the delaying party had given up on its claim. Knorr, 178 N.J. at 181.

When determining whether the doctrine of laches should be invoked, the court considers: (1) the length of the delay, (2) the reasons for the delay, and (3) how the circumstances of the parties have changed over the course of the delay. Ibid. "The core equitable concern in applying laches is whether [the opposing] party has been [unfairly] harmed by the delay." Ibid. "Inequity, more often than not, will turn on whether a party has been misled to his harm by the delay." Lavin, 90 N.J. at 153.

Judge Vena properly exercised his discretion in declining to apply laches to plaintiff's action. First, we are satisfied that defendant was not prejudiced by

the complained of delay. Second, as noted, plaintiff had no duty to intervene in the Yukelson Litigation and was entitled to litigate his claim in a separate action. As such, defendant's claimed harm, that it had to litigate a separate suit and expend resources in the process, is not attributable to any delay caused by plaintiff, but rather plaintiff's valid decision to litigate his claim separately from the Yukelson matter and defendant's election not to join plaintiff in that litigation. See Lavin, 90 N.J. at 153. Relatedly, defendant has shown no change in circumstances due to any delay, and could not have had a good faith belief that plaintiff had abandoned his claim as plaintiff repeatedly followed-up with defendant and sought information about the status of his fee. See Knorr, 178 N.J. at 181. Finally, plaintiff's alleged delay in filing suit was not "unreasonable" or "unexplained." Lavin, 90 N.J. at 151. Instead, plaintiff promptly filed suit after defendant tendered the insufficient payment.

### III.

Defendant also argues that Judge Vena erred by granting plaintiff summary judgment in light of the existence of genuine and material factual questions in the motion record. Specifically, defendant claims "[t]wo key factual disputes prevented the grant of summary judgment." First, defendant argues the meaning of the term "our attorney's fees" as used in the September

20

12, 2005 fee sharing agreement is ambiguous and that it intended the term to refer to defendant's "ultimate net legal fee following deductions for costs and disbursements" rather than the gross fee it received.

The second factual issue asserted by defendant is whether plaintiff agreed to defendant withholding a portion of the fee while the Yukelson Litigation was ongoing. Defendant asserts plaintiff "explicitly agreed to [defendant] holding his fee back," which it claims "confirm[s] [defendant's] interpretation of the agreement." Defendant, therefore, argues Judge Vena erred by failing to consider plaintiff's conduct in interpreting the meaning of the fee sharing agreement.

Relying on Shanley & Fisher, P.C. v. Sisselman, 215 N.J. Super. 200 (App. Div. 1987), defendant also maintains that Judge Vena's summary judgment analysis amounted to a "trial by affidavits" because no depositions were taken in the case and he did not hold a hearing to resolve factual discrepancies in the summary judgment record. We disagree with all of defendant's arguments.

We "review[] de novo the . . . entry of summary judgment[,]" Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 115 (2014), applying "the same standard as the trial court," Conley v. Guerrero, 228 N.J. 339, 346 (2017). Summary

judgment is appropriate if the record demonstrates there is "no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c); Ben Elazar v. Macrietta Cleaners, Inc., 230 N.J. 123, 135 (2017). When determining whether there is a genuine issue of material fact, we must consider "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill, 142 N.J. at 540.

If no genuine issue of material fact exists, the inquiry turns to "whether the trial court correctly interpreted the law." DepoLink Ct. Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (quoting Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 494 (App. Div. 2007)). We owe no deference to the trial court's legal analysis or conclusions. The Palisades at Fort Lee Condo. Ass'n, 230 N.J. at 442.

"The interpretation or construction of a [written] contract is usually a legal question for the court . . . ." Driscoll Constr. Co. v. State, Dep't of Transp., 371 N.J. Super. 304, 313 (App. Div. 2004). "The court makes the determination whether a contractual term is clear or ambiguous." Schor v. FMS Fin. Corp., 357 N.J. Super. 185, 191 (App. Div. 2002). A contract term is ambiguous when

it is susceptible to more than one reasonable interpretation. See Powell v. Alemaz, Inc., 335 N.J. Super. 33, 44 (App. Div. 2000). The court should interpret contract terms "so as to avoid ambiguities, if the plain language of the contract permits." Stiefel v. Bayly, Martin and Fay of Conn., Inc., 242 N.J. Super. 643, 651 (App. Div.1990). Interpretation of a contract should not be decided on summary judgment when "there is uncertainty, ambiguity or the need for parol evidence in aid of interpretation." Great Atl. & Pac. Tea Co. v. Checchio, 335 N.J. Super. 495, 502 (App. Div. 2000).

"In interpreting a contract, a court must try to ascertain the intention of the parties as revealed by the language used, the situation of the parties, the attendant circumstances, and the objects the parties were striving to attain." Celanese Ltd. v. Essex Cnty. Improvement Auth., 404 N.J. Super. 514, 528 (App. Div. 2009). "Generally, the terms of an agreement are to be given their plain and ordinary meaning." M.J. Paquet, Inc. v. New Jersey Dep't of Transp., 171 N.J. 378, 396 (2002). "If the terms of a contract are clear, [courts] must enforce the contract as written . . . ." Graziano v. Grant, 326 N.J. Super. 328, 342 (App. Div. 1999). Further, "the language used must be interpreted '"in accord with justice and common sense."'" Homann v. Torchinsky, 296 N.J.

Super. 326, 334 (App. Div. 1997) (quoting Krosnowski v. Krosnowski, 22 N.J. 376, 387 (1956)).

We are satisfied that the term "our attorney's fees" as used in the fee sharing agreement is not susceptible to more than one reasonable interpretation. Although "attorney's fees" is an undefined term in the agreement, it commonly refers to the amount charged to a client in exchange for legal services rendered, rather than the net profit an attorney ultimately realizes. Indeed, our Rules of Professional Conduct consistently refer to attorney's fees as the amount charged to or collected from a client. See RPC 1.5(d) (prohibiting attorneys from "charg[ing] or collect[ing]" certain types of fees); RPC 1.17(d) (discussing "fees charged to clients"); RPC 7.1(a)(4)(ii) (discussing "fixed or contingent fee[s] charged for a specific legal service"); see also R. 1:21-7 (c), (e) (discussing contingent fees that may be "charge[d] or collect[ed]" by an attorney).

Similarly, Black's Law Dictionary, defines "attorney's fee" as "[t]he charge to a client for services performed for the client, such as an hourly fee, a flat fee, or a contingent fee." Black's Law Dictionary 160 (11th ed. 2019); see also Toensing v. Attorney Gen. of Vermont, 212 A.3d 180, 183 (Vt. 2019) (citing definition); In re Nalle Plastics Family Ltd. P'ship, 406 S.W.3d 168, 172 (Tex. 2013) (same); State v. Webb, 591 S.E.2d 505, 509 (N.C. 2004) (same).

The personal injury settlement statement defendant generated and provided to Angamarca upon receipt of the funds in question is consistent with this interpretation as it clearly stated that the "attorney's fees" were calculated as one-third of the settlement amount after disbursements, without referencing funds owed to plaintiff, or any other lawyer.

In addition, the fee sharing agreement contains no indication that plaintiff's share of the fees could be reduced by subsequent counsel fee arrangements with third parties that were unknown to the relevant entities at the time of contracting. Indeed, to accept defendant's interpretation would allow defendant to unilaterally modify its obligations to plaintiff and reduce a fee award based on unanticipated expenses without the contracting parties' consent. Such an interpretation runs counter to notions of "justice and common sense," and we, therefore, decline to accept it. Homann, 296 N.J. Super. at 334 (quoting Krosnowski, 22 N.J. at 387); see also Pacifico v. Pacifico, 190 N.J. 258, 266 (2007) ("The court's role is to consider what is written in the context of the circumstances at the time of drafting and to apply a rational meaning in keeping with the 'expressed general purpose.'" (quoting Atl. N. Airlines v. Schwimmer, 12 N.J. 293, 302 (1953))).

Finally, the only suggestion in the record that "our attorney's fees" as used in the fee agreement was intended to differ from the common usage of the term is contained in Saperstein's certification. Because that statement is "conclusory and self-serving" it is "insufficient to overcome [plaintiff's summary judgment] motion." Puder v. Buechel, 183 N.J. 428, 440-41 (2005). Indeed, the record is devoid of any proofs regarding how Sacks, the other party to the agreement, understood the term at the time of the September 12, 2005 agreement. See also Schor, 357 N.J. Super. at 191 ("[A] party to a contract 'is bound by the apparent intention he or she outwardly manifests to the other party. It is immaterial that he or she had a different, secret intention from that outwardly manifested.'" (quoting Domanske v. Rapid-American Corp., 330 N.J. Super. 241, 246 (App. Div. 2000))).

We are unpersuaded by defendant's remaining arguments. First, Judge Vena's analysis did not amount to a "trial by affidavits." Instead, he reached his decision by resolving a single question of law, the meaning of the term "our attorney's fees" in the fee sharing agreement. See Driscoll Constr. Co., 371 N.J. Super. at 313. Similarly, because Judge Vena's analysis was based on an unambiguous term in a contract, he had no reason to consider plaintiff's conduct in interpreting the meaning of the agreement. However, even if the judge had

considered such proofs, plaintiff's conduct would not shed light on the agreement's meaning, as he was not a party to it when it was created.  See Pacifico, 190 N.J. at 266 ("The court's role is to consider what is written in the context of the circumstances at the time of drafting . . . .") (emphasis added).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION